**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF NEW YORK**
------------------------------------------------------------x

JOHN DOE,                                    |    Case No.
                      |
         **Plaintiff,**            |
                      |
   **v.**                                    |
                      |
**ROCHESTER INSTITUTE OF**                   |
**TECHNOLOGY,**                              |
                      |
         **Defendant.**           |
------------------------------------------------------------x

## COMPLAINT AND JURY DEMAND

Plaintiff John Doe (a pseudonym),[1] by his attorneys Nesenoff & Miltenberg LLP, as and for his Complaint against Defendant Rochester Institute of Technology ("RIT"), respectfully alleges as follows:

## THE NATURE OF THIS ACTION

1.      Plaintiff John Doe ("John Doe"), a suspended undergraduate student at RIT, brings this action for Title IX sex discrimination, breach of contract and promissory estoppel.

2.      John Doe and Jane Roe were fellow students at RIT, and before the complained of incident, John Doe and Jane Roe had consensual sexual intercourse. On the night of July 3-4, 2020, the two partied together, drinking alcoholic

---

[1] Plaintiff John Doe has filed herewith a motion to proceed by pseudonym with respect to both John Doe and Jane Roe.

beverages, and Jane Roe invited John Doe to spend the night with her in her bed, which invitation John Doe accepted. The way Jane Roe looked at John Doe that night was consistent with how she looked at him when they had consensual sexual intercourse. When John Doe and Jane Roe got into bed, John Doe and Jane Roe engaged in sexual conduct short of sexual intercourse (John Doe fingering Jane Roe and Jane Roe stroking John Doe's penis), after which the two slept together the rest of the night. John Doe believed he had consent based upon his prior sexual experiences with Jane Roe and this present matter during which, by those same actions, she had indicated her consent.

3.     Almost eight months later, on March 15, 2021, Jane Roe filed a university complaint with RIT's Title IX office accusing, falsely, John Doe of non-consensual sexual misconduct on the night of July 3, 2020. An investigation by RIT's Title IX office resulted in a report dated April 21, 2021, recording the statements by John Doe, Jane Roe and one of Jane Roe's friends and collecting documents. RIT's Title IX Office determined that a hearing was warranted whether John Doe engaged in non-consensual sexual contact and non-consensual sexual intercourse with Jane Roe in the early morning hours of July 4, 2020.

4.     On May 24, 2021, a hearing was held, at which both John Doe and Jane Roe said they were not incapacitated and John Doe stated what sexual contact he had with Jane Roe was consensual based on his prior experience with Jane Roe

2

having sexual intercourse and how she was looking at John Doe that evening; and on May 28, 2021, the Hearing Officers ruled that John Doe had engaged in non-consensual sexual contact but not non-consensual sexual intercourse with Jane Roe and that John Doe was put on probation until July 5, 2021.

5.      Both John Doe and Jane Roe appealed; and on July 12, 2021, it was determined that the case would be re-heard because new information which was not known or available at the time of the first hearing, including relevant text messages from a witness that John Doe said supported his position that what sexual contact there was in the early morning hours of July 4, 2020 was consensual.

6.      On September 3, 2021, a second hearing was held, at which John Doe and Jane Roe appeared personally and John Doe stated what sexual contact he had with Jane Roe was consensual; but on September 9, 2021, the second Hearing Officers ruled that John Doe had engaged in non-consensual sexual contact and non-consensual sexual intercourse with Jane Roe, that John Doe had violated the Non-Contact Order as to Jane Roe and that John Doe was suspended until the Fall 2022 semester and subject to counseling and service requirements.

7.      John Doe appealed the second Hearing Officers' decision, complaining about the fairness of the hearing and the severity of the outcome, as there was not a rational basis for the harsher findings and sanction; but on October 12, 2021, the September 9, 2021 outcome was upheld, and the sanctions stayed in place.

8.     John Doe now brings this action for Title IX discrimination based on John Doe's male sex because John Doe is innocent of the charges and gender bias was a motivating factor behind the erroneous findings. John Doe also complains of breach of contract and promises for RIT's failure to follow RIT's policies and procedures governing sexual misconduct and do so fairly.

## THE PARTIES

9.     John Doe is a natural male person who is a resident of Orange County, New York.

10.     RIT is a private technology-oriented university with nine colleges, including for Engineering, Liberal Arts, Business, Computing and Information Sciences, Health Sciences and Science, and two degree-granting academic units, the National Technical Institute for the Deaf and the Institute for Sustainability. In the Fall 2021, RIT had 19,718 undergraduate and graduate students. RIT is located in Rochester, New York with administrative offices at One Lomb Memorial Drive, Rochester, New York 14623. RIT has been receiving federal funding. RIT received federal funding in the amount of $129,702,000 in the fiscal year ending June 30, 2021 and in the amount of $111,862,000 in the fiscal year ending June 30, 2020.

## JURISDICTION AND VENUE

11.     This Court has federal question and supplemental jurisdiction pursuant to 28 U.S.C. § 1331, 28 U.S. C. § 1343 and 28 U.S.C. § 1367 because: (i) claims

herein arise under federal law; (ii) claims arise under federal civil rights law and (iii) the state law claims are so closely related to the federal law claims as to form the same case or controversy under Article III of the U.S. Constitution.

12.     This Court has personal jurisdiction over RIT on the grounds that RIT is conducting business within the State of New York, is a resident of the State of New York and whose actions that are the subject of this action took place in the Northern District of New York.

13.     Venue for this action properly lies in this district pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claim occurred in this judicial district.

## FACTUAL ALLEGATIONS COMMON TO ALL CAUSES OF ACTION

### A.     Federal Statutes and Regulations Forbid Gender Discrimination And Retaliation and Require Prompt and Equitable Disciplinary Proceedings

14.     Title IX of the Education Amendments Act of 1972 provides in relevant part that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a).

15.     Title IX applies to all public and private educational institutions that receive federal funds, including colleges and universities.

16.     RIT is a recipient of federal funds and is therefore bound by Title IX and its regulations.

17.     As interpreted by federal courts, Title IX protects students attending federally-funded educational institutions from discrimination based on gender. A federally-funded educational institution violates Title IX if it subjects a male student to adverse treatment because of his gender.

18.     Complementing Title IX, the Jeanne Clery Disclosure of Campus Security Policy and Campus Crime Statistics Act is a federal statute requiring federally-funded educational institutions to maintain and disclose campus crime statistics and security information. 20 U.S.C. § 1092(f).

19.     Under the Clery Act, as amended in 2013, school disciplinary procedures for alleged sexual misconduct must "provide a prompt, fair, and impartial investigation and resolution." 20 U.S.C. § 1092(f)(8)(B)(iv)(i)(aa).

20.     The U.S. Department of Education's regulations implementing Title IX require federally-funded educational institutions to "adopt and publish grievance procedures providing for prompt and equitable resolution of student…complaints alleging any action which would be prohibited" by Title IX and implementing federal regulations. 34 C.F.R. § 106.8(b).

21.     Regulations implementing the Clery Act require that campus Title IX proceedings:

a.      "[i]nclude a prompt, fair, and impartial process from the initial investigation to the final result"

b.      be conducted by trained officials

c.      "be completed within reasonably prompt timeframes designated by an institution's policy, including a process that allows for the extension of timeframes for good cause with written notice to the accuser and the accused of the delay and the reason for the delay"

d.      be conducted in a way that is "consistent with the institution's policies and transparent to the accuser and accused"

e.      include "timely notice of meetings at which the accuser or accused, or both, may be present"

f.      give "timely and equal access to the accuser, the accused, and appropriate officials to any information that will be used during informal and formal disciplinary meetings and hearings"

g.      be "[c]onducted by officials who do not have a conflict of interest or bias for or against the accuser or the accused"

h.      include in "any initial, interim, and final decision by any official or entity authorized to resolve disciplinary matters" "the rationale for the result and the sanctions."

34 C.F.R. § 668.46(k).

**B.      OCR's 2001 Guidance Affirms the Requirement that Disciplinary Proceedings Be Prompt and Impartial**

22.     The Department of Education's Office for Civil Rights ("OCR") is the federal agency in charge of enforcing Title IX compliance.

23.      In 2001, after a public notice and comment period, OCR issued a document entitled "Revised Sexual Harassment Guidance: Harassment of Students by School Employees, Other Students, or Third Parties" ("2001 Guidance").

24.     OCR's 2001 Guidance "identified a number of elements in evaluating whether a school's grievance procedures are prompt and equitable." These elements apply to private and public colleges and universities and include "[a]dequate, reliable, and impartial investigation of complaints, including the opportunity to present witnesses and other evidence," and "[d]esignated and reasonably prompt timeframes for the major stages of the complaint process."

25.     The 2001 Guidance further stated that *"[a]ccording due process to both parties involved, will lead to sound and supportable* decisions" and that the "due process" requirement applies to both public and private colleges and universities.

## C.     Starting in 2011, the Federal Government Pressures Educational Institutions to Provide More Protection to Students Alleging Sexual Assault, Focusing on Protection of Women

26.     Starting in 2011, the federal government, including OCR, began to take aggressive steps to combat what it viewed as an epidemic of sexual assault on college campuses.

27.     On April 4, 2011, the Office for Civil Rights ("OCR") of the U.S. Department of Education ("DOE") sent a "Dear Colleague Letter" to colleges and universities (hereinafter referred to as the "April 2011 Dear Colleague Letter"). The "April 2011 Dear Colleague Letter," while now revoked, was in effect when RIT's original disciplinary procedures were put in place. Before the 2011 Dear Colleague Letter, colleges and universities generally did not use its disciplinary procedures to

adjudicate sexual misconduct cases and certainly not in the manner and frequency that they have since the issuance of the April 2011 Dear Colleague Letter. The April 2011 Dear Colleague Letter thus provides a necessary set of background facts to this action: http://www2.ed.gov/about/offices/list/ocr/letters/colleague-201104.html.

28.     Although the April 2011 Dear Colleague Letter marked a substantial change in OCR's position on how schools should handle disciplinary proceedings under Title IX, OCR did not conduct the public notice and comment process required for proposed regulations. *See* 5 U.S.C. § 553. The 2011 Dear Colleague Letter (p. 1) defined discrimination on the basis of sex to include sexual harassment of students, which sexual harassment was defined to include acts of sexual violence. The April 2011 Dear Colleague Letter provided that, in order to comply with Title IX, colleges and universities must have prompt procedures to investigate and resolve complaints of sexual misconduct.

29.     The press release announcing the April 2011 Dear Colleague Letter stated that it was "the first specifically advising schools, colleges and universities that their responsibilities under Title IX include protecting students from sexual violence" and that it included "new steps to help our nation's schools, universities and colleges end the cycle of sexual violence on campus." The press release made clear the focus was on protecting women: it stated that despite past progress "the threat of violence and abuse continues for a new generation of women;" it lauded

9

the "unprecedented coordination and cooperation across the federal government to combat violence against women," it stated that one in five women "will be a victim of sexual assault during college" (a statistic that would later be thoroughly discredited) and it highlighted "the Administration's commitment to raising awareness and promoting policies to prevent sexual violence against women of all ages."

30.     The April 2011 Dear Colleague Letter itself explicitly focused on protection of women and effectively equated "victims" and "complainants" in sexual misconduct proceedings as women who must receive preferential treatment. For instance, the April 2011 Dear Colleague Letter: (i) stated -- incorrectly -- that "1 in 5 women are victims of completed or attempted sexual assault while in college" (p. 2); (ii) warned that "the majority of campus sexual assaults occur when women are incapacitated, primarily by alcohol" (p. 2); (iii) suggested educational institutions seek grants from the U.S. Department of Justice's Office on Violence against Women, which require institutions "develop victim service programs and campus policies that ensure victim safety, [and] offender accountability . . ." (p. 19); and (iv) warned education institutions that they must "never" view the "victim at fault for sexual violence" if she has been using "alcohol or drugs" and asks "schools to consider" providing students who violate alcohol or drug policies with amnesty if they allege they were sexually assaulted while consuming alcohol or drugs (p. 15).

31.     The 1 in 5 "statistic" cited by the April 2011 Dear Colleague Letter came from a disputed 2007 study, which was based on an overly broad definition of sexual assault and which, according to the study authors, was not derived from a nationally representative sample. Schow, "No, 1 in 5 Women Have Not Been Raped on College Campuses," *Washington Examiner*, August 13, 2014, http://www.washingtonexaminer.com/no-1-5-women-have-not-been-raped-on-college-campuses/articles/2551980.

32.     A Bureau of Justice Statistics (DOJ) study, 1995-2013, published in December 2014 found that college-age female students on campus were less likely to be victims of sexual assault than non-students and the real number of college women assault victims is .03 in 5; these statistics do not support the notion of a "crisis" of violence against *women. Rape and Sexual Assault Victimization among College Age Females, 1995-2013* (Special Report), U.S. Department of Justice, December 2014, http://www.bjs.gov.content/pub/pdf/ravcaf9513.pdf.

33.     The April 2011 Dear Colleague Letter, in order to provide females what was unjustified preferential treatment, imposed numerous mandates to make it more difficult for males accused of sexual misconduct to defend themselves. The "April 2011 Dear Colleague Letter" (pp. 10-11) required schools to adopt a relatively low burden of proof -- the preponderance of the evidence ("more likely than not") -- in cases involving sexual misconduct, including sexual assault. Several colleges had

been using "clear and convincing," and some, like Stanford University, applied the criminal standard, "beyond a reasonable doubt." The April 2011 Dear Colleague Letter (p. 12) also strongly discouraged allowing cross-examination of complainants because it "may be traumatic or intimidating" to the alleged victim. The "April 2011 Dear Colleague Letter" stated (p. 12) that schools should give both parties the right to appeal a decision, which amounts to double jeopardy for an accused student. After the April 2011 Dear Colleague Letter was published, schools changed their sexual assault and sexual harassment policies and procedures. Additionally, the "April 2011 Dear Colleague Letter" stated (pp. 15-16) that schools should "minimize the burden on the complainant," transferring alleged perpetrators, if necessary, away from shared courses or housing.

34.     On April 29, 2014, the OCR published a document signed by then Assistant Secretary of Education in charge of the OCR Catherine E. Lhamon ("Secretary Lhamon") and bearing the title "Questions and Answers on Title IX and Sexual Violence." (the "2014 Q&A"): http://www2.ed/gov./about/offices/

list/ocr/docs/qa-201404-title-ix.pdf. The 2014 Q&A continued OCR's effort to restrict students' ability to defend themselves by reducing or eliminating the ability to expose credibility flaws in the allegations made against them. For example, OCR's 2014 Q&A states that schools: (i) "must not require a complainant to be present" at sexual misconduct disciplinary hearings" (p. 30); (ii) may decide to

eliminate all opportunities for "cross-examination" (p. 31); and (iii) must avoid "revictimization" by minimizing the number of times a victim is interviewed so "complainants are not unnecessarily required to give multiple statements about a traumatic event" (pp. 30, 38).

35.    Neither OCR's April 2014 Q&A nor the April 2011 Dear Colleague Letter were subject to notice-and-comment rulemaking, and both the OCR's April 2014 Q&A and the April 2011 Dear Colleague Letter constituted substantive decision-making.

36.    In a letter dated December 30, 2014, the OCR informed the Harvard Law School that the sexual misconduct policy it continued to use after issuance of the April 2011 Dear Colleague Letter "*improperly* used a 'clear and convincing' evidence standard of proof in its Title IX grievance procedures, *in violation of Title IX*." (Emphasis in original.) The OCR letter stated that the higher clear and convincing standard of proof was inconsistent with preponderance of the evidence standard required by Title IX for investigating allegations of sexual harassment or violence and directed the Harvard Law School, by January 15, 2015, to adopt procedures "that comply with the applicable Title IX regulations and OCR policy," which procedures must include "[a]n explicit statement that the preponderance of evidence standard will be used for investigating allegations of sexual harassment or violence," https://www2.ed.gov/documents/press-releases/harvard-law-letter.pdf.

Other schools, including State University of New York-Buffalo and Princeton University, were required by the OCR to use the preponderance of the evidence standard in adjudicating sexual misconduct cases.

37.    The April 2011 Dear Colleague Letter and April 2014 Q&A led colleges and universities to devise victim centered procedures for adjudicating sexual assault that are not neutral and impartial; and the reality is that males are almost always the "accused" respondents and females are almost always the "victim" complainants. Almost all complainants are females and almost all respondents are males. An United Educators study showed 99% of the accused are male. "Confronting Campus Sexual Assault: An Examination of Higher Education Claims," https://web.archive.org/web/201701225139/https://www.ue.org.uploaded Files/Confronting%20Campus%20Sexual%20Assault.pdf.

38.    While the April 2011 Dear Colleague Letter reaffirmed in principle that both accusers and accused have the right to have a prompt and equitable resolution, including the right to an adequate, reliable, and impartial investigation, similar and timely access to any information that will be used at the hearing and adequately trained factfinders and decision makers, the April 2011 Dear Colleague Letter also, however, contained other provisions which expanded the nature and scope of schools' responsibility to address sexual misconduct, essentially compelling them to choose between fundamental fairness for students and continued federal funding.

These provisions are not required by Title IX and are not consistent with legal precedent and due process.

39.     Among other things, the April 2011 Dear Colleague Letter defined sexual harassment broadly as "unwelcome conduct of a sexual nature," conflating cases based on conduct with cases based on speech; stated that "mediation is not appropriate even on a voluntary basis" in cases involving alleged sexual assault; directed schools to ensure "steps taken to accord due process rights to the alleged perpetrator do not restrict or unnecessarily delay the Title IX protections for the complainant"; directed schools to take interim steps to protect complainants and "minimize the burden on the complainant"; "strongly discourage[d]" schools from allowing cross-examination of parties; and urged schools to focus on victim advocacy.

40.     Even though the April 2011 Dear Colleague Letter purported to be a "guidance" document and did not go through rulemaking procedures, OCR framed many of its directives as mandatory. Moreover, the letter contained an explicit threat to colleges and universities: "When a recipient does not come into compliance voluntarily, OCR may initiate proceedings to withdraw Federal funding by the Department or refer the case to the U.S. Department of Justice for litigation."

41.     The overriding purpose of the April 2011 Dear Colleague Letter was "to make it easier for victims of sexual assault to make and prove their claims and for

the schools to adopt punitive measures in response," and OCR "demand[ed] that universities do so or face a loss of federal funding." *Doe v. Brandeis Univ.*, 177 F. Supp. 3d 561, 572 (D. Mass. 2016). As the *Brandeis* court observed, while "[t]he goal of reducing sexual assault, and providing appropriate discipline for offenders, is certainly laudable," the effect of the letter was "the elimination of basic procedural protections—and the substantially increased risk that innocent students will be punished."

42.    The April 2011 Dear Colleague Letter has been described as the "first warning shot" that OCR intended to punish any school that failed to handle sexual assault proceedings as OCR wanted.

43.    After the 2011 Dear Colleague Letter, the federal government continued to pressure colleges to deal aggressively with reported sexual assaults, to adopt procedures that do not safeguard the rights of the accused, and to start with the presumption that a complainant is telling the truth.

44.    In 2014, OCR released additional guidance in which it reiterated many of the directives set forth in the April 2011 Dear Colleague Letter, including the directive to "ensure that steps to accord any due process rights do not restrict or unnecessarily delay the protections provided by Title IX to the complainant." In addition, OCR advised schools to give employees and students "trauma-informed"

training and said, "hearings should be conducted in a manner that does not inflict additional trauma on the complainant."

45.     The same year, a White House Task Force was created, co-chaired by the Office of the Vice President and the White House Council on Women and Girls. The Task Force continued the government's focus on protection of women, with a mission "to tell sexual assault survivors that they are not alone" and "help schools live up to their obligation to protect students from sexual violence."

46.     The Task Force's first report opened with the claim that "[o]ne in five women is sexually assaulted in college," stated that the federal government was ramping up Title IX enforcement efforts, and stressed again that schools found in violation of Title IX risked losing federal funding.

47.     The Task Force also pressed colleges and universities to provide "trauma-informed" training for their officials, stating that "when survivors are treated with care and wisdom, they start trusting the system, and the strength of their accounts can better hold offenders accountable."

48. The report stated that the Justice Department, through its Center for Campus Public Safety and its Office on Violence Against Women, was developing trauma-informed training programs.

49. Ultimately, the Justice Department funded a "Start by Believing" campaign under which investigators are trained to investigate cases from an initial

presumption of guilt and write reports "that successfully support the prosecution of sexual assault cases." End Violence Against Women International, *Effective Report Writing: Using the Language of Non-consensual Sex*, at 5, https://www.evawintl.org/library/DocumentLibraryHandler.ashx?id=43; *see also* Campus Action Kit, *Start by Believing*, https://www.startbybelieving.org/wp-content/uploads/2018/08/Campus-Action-Kit.pdf.

50.     Among other things, "Start by Believing" training direct investigators to "recreate the entire reality of the sexual assault from the perspective of the victim."

51.     In sum, "Start by Believing" training tells investigators: "By writing the report to recreate the reality of the sexual assault and refute potential defense strategies, investigators can greatly increase the likelihood that charges will be filed in the case, and it will result in a conviction. They may even help to make this process faster, smoother, and easier for the victim than it would otherwise be. As one experienced prosecutor summarized, 'a well-written report can make a jury trial into a bench trial and a bench trial into a guilty plea.'"

52.     The Obama Administration, through the DOE and OCR, treated the April 2011 Dear Colleague Letter as binding on regulated parties for all practical purposes and thus has pressured colleges and universities to aggressively pursue investigations of sexual assaults on campuses. Then Secretary Lhamon, Assistant Secretary of the Department of Education ("DOE") in charge its Office for Civil

Rights ("OCR"), delivered what was treated as marching orders by colleges and universities.

53.     In February 2014, then Assistant Secretary Lhamon told college officials attending a conference at the University of Virginia that schools need to make "radical" change. According to the Chronicle of Higher Education, college presidents said afterward that there were "crisp marching orders from Washington." Assistant Secretary Lhamon told college officials attending a conference that existing practices for handling sexual misconduct complaints send a message "that victimized students are worth less than the people who assault them;" that school officials and she as "chief enforcer" needed to "radically change that message;" and that "if you don't want to do it together, I will do it to you." "Colleges Are Reminded of Federal Eye on Handling of Sexual-Assault Cases," Chronicle of Higher Education, February 11, 2014.

54.     In June 2014, then Assistant Secretary Lhamon testified at a Senate Hearing in that "some schools are still failing their students by responding inadequately to sexual assaults on campus. For those schools, my office and this Administration have made it clear that the time for delay is over." Assistant Secretary Lhamon stated at the Senate Hearing in June 2014 that "we do" expect institutions to comply with the April 2011 Dear Colleague Letter. Assistant Secretary Lhamon told the Senate Committee, "This Administration is committed to

using all its tools to ensure that all schools comply with Title IX . . ." She further told the Committee: If OCR cannot secure voluntary compliance from the recipient, OCR may initiate an administrative action to terminate and/or refuse to grant federal funds or refer the case to the DOJ to file a lawsuit against the school. Assistant Secretary Lhamon additionally stood behind the "April 2011 Dear Colleague Letter."

55.    In July 2014, then Assistant Secretary Lhamon, speaking at a conference on campus sexual assault held at Dartmouth College, stated that she was prepared to cut off federal funding to schools that violate Title IX and that she would strip federal funding from any college found to be non-compliant with the requirements of the April 2011 Dear Colleague Letter. "Do not think it's an empty threat," then Assistant Secretary Lhamon warned. She went on to describe that enforcement mechanism as part of a set of "very, very effective tools," adding "If a school refuses to comply with Title IX in any respect, I will enforce." Assistant Secretary Lhamon was quoted: "It's not surprising to me that we haven't gone to the last step. . . . It means that so far the process has been working." Meredith Clark, "Official to colleges: Fix sexual assault or lose funding," July 15, 2014, available at: http://www.msnbc.com/msnbc/campus-sexual-assaultconference-dartmouth-college#51832.

56.     Then Assistant Secretary Lhamon was quoted in the *Los Angeles Times* stating, "We don't treat rape and sexual assault as seriously as we should, . . . [There is] a need to push the country forward." Savage and Timothy M. Phelps, "How a little-known education office has forced far-reaching changes to campus sex assault investigations," *Los Angeles Times*, August 17, 2015.

57.     To support effectively making the "April 2011 Dear Colleague Letter" binding, the OCR hired hundreds of additional investigators for Title IX enforcement. The sharp increase in the number of investigations was accompanied by increases in the scope of OCR's investigations, in findings that schools had violated Title IX, and in the imposition of punitive measures as a result. The Federal Government investigated over 250 schools for possible Title IX violations, including notable schools. According to the Chronicle of Higher Education, that number eventually grew to over 500. The overwhelming majority of OCR's investigations and findings have involved alleged violations of the rights of complaining students. Indeed, in 2016, OCR *for the first time* found Title IX violations in response to a complaint by a disciplined student.

58.     Colleges and universities, including RIT, were fearful of and concerned about being investigated or sanctioned by the DOE and/or of potential Title IX lawsuits by the U.S. Department of Justice ("DOJ"). The White House issued a report entitled "Not Alone" in April 2014, which included a warning that if the OCR

finds a Title IX violation, the "school risks losing federal funds," that the DOJ shares authority with OCR for enforcing Title IX and may initiate an investigation or compliance review of schools and that if a voluntary resolution cannot be reached, the DOJ may initiate litigation.

59.    In July 2016, Vice President Biden suggested that schools that do not comply with administration guidelines could be stripped of federal funding. "Obama, Biden Won't Visit Universities That Fall Short In Addressing Sexual Assault," *Huffington Post*, July 4, 2016 ("The vice president said he'd like to take away federal funding from those universities.")

60.    To revoke federal funds -- the ultimate penalty -- is a powerful tool because educational institutions receive billions of dollars a year from the federal government. Anne Neal of the American Council of Trustees and Alumni was quoted as follows: "There is a certain hysteria in the air on this topic, . . . It's really a surreal situation, I think." She explained that "schools are running so scared of violating the civil rights of alleged victims that they end up violating the due process rights of defendants instead." "How Campus Sexual Assaults Came To Command New Attention," NPR, August 12, 2014.

61.    The DOE and OCR created a significant amount of pressure on colleges and universities to treat all those accused of sexual misconduct with a presumption of guilt. "Presumed Guilty: College men accused of rape say the scales are tipped

22

against them," Chronicle of Higher Education, September 1, 2014. In the same article, the Chronicle noted that different standards were applied to men and women: "Under current interpretations of colleges' legal responsibilities, if a female student alleges sexual assault by a male student after heavy drinking, he may be suspended or expelled, even if she appeared to be a willing participant and never said no. That is because in heterosexual cases, colleges typically see the male student as the one physically able to initiate sex, and therefore responsible for gaining the woman's consent." "Presumed Guilty: College men accused of rape say the scales are tipped against them," Chronicle of Higher Education, September 1, 2014.

62.     Robert Dana, Dean of Students at the University of Maine, told NPR that some rush to judgment is inevitable. "I expect that that can't help but be true," he says. "Colleges and universities are getting very jittery about it." "Some Accused Of Sexual Assault On Campus Say System Works Against Them," NPR, September 3, 2014.

63.     In response to pressure from OCR, DOJ, and the Obama White House, educational institutions, such as RIT, limited procedural protections afforded to male students, such as John Doe, in sexual misconduct cases.

**D.**   **The Department of Education Modifies Its Approach to Title IX Enforcement, Focusing on Fairness to All Parties**

64.   In September 2017, the Department of Education took first steps toward restoring procedures that would provide basic fairness to both accusing and accused students in Title IX proceedings.

65.   Recognizing the harmful results of the April 2011 Dear Colleague Letter, then Secretary of Education Betsy DeVos observed that "[n]o school or university should deprive any student of his or her ability to pursue their education because the school fears shaming by—or loss of funding from— Washington," that "no student should be forced to sue their way to due process," and that "[o]ne person denied due process is one too many." On September 7, 2017, Department of Education Secretary Betsy DeVos denounced the campus sexual misconduct proceedings as denying due process in a manner that is wholly un-American: www.ed.gov/news/speeches/secretary-devos-prepared-remarks-title-ix-enforcement.

66.   Stating that "the era of 'rule by letter' is over" and "[t]here must be a better way forward," then Secretary DeVos announced that the Department of Education would "launch a transparent notice-and-comment process to incorporate the insights of all parties" in an effort "to ensure that America's schools employ clear, equitable, just, and fair procedures that inspire trust and confidence."

67.     Then, on September 22, 2017, the Department of Education announced that it was withdrawing the 2011 Dear Colleague Letter and the 2014 Questions & Answers on Title IX Sexual Violence, noting in part the criticism of those documents for placing "improper pressure upon universities to adopt procedures that do not afford fundamental fairness" and are "overwhelmingly stacked against the accused."

68.     A Q&A on Campus Sexual Misconduct, which the Department adopted the same day, reflects a return to the original principles of Title IX, the Clery Act, and their implementing regulations, stating among other things that "the burden is on the school—not on the parties—to gather sufficient evidence to reach a fair, impartial determination as to whether sexual misconduct has occurred…;" that "[a] person free of actual or reasonably perceived conflicts of interest and biases for or against any party must lead the investigation on behalf of the school;" that "[d]ecision-making techniques or approaches that apply sex stereotypes or generalizations may violate Title IX and should be avoided so that the adjudication proceeds objectively and impartially;" and that "[a]n equitable investigation of a Title IX complaint requires a trained investigator to analyze and document the available evidence to support reliable decisions, objectively evaluate the credibility of parties and witnesses, synthesize all available evidence -- including both inculpatory and exculpatory evidence -- and take into account the unique and complex circumstances of each case."

69.    In May 6, 2020, then Secretary Betsy DeVos announced that, after a rule-making process conducted pursuant to the Administrative Procedure Act, new Title IX regulations would go into effect on August 14, 2020.

70.    The Title IX regulations effective August 14, 2020 state that the university or college disciplinary process shall treat complainants and respondents equitably, objectively evaluate the evidence, not have conflicts of interest or bias, presume respondents are not responsible, have prompt time frames, identify the burden of proof that is to be applied uniformly and have support services for both complainants and respondents. 34 C.F.R. 106.45(b)(1).

71.    The Title IX regulations effective August 14, 2020, require formal written notice of allegations that contains "sufficient details known at the time and with sufficient time to prepare a response before any initial interview" – "[s]ufficient details include the identities of the parties involved in the incident, if known, the conduct allegedly constituting sexual harassment, and the date and location of the alleged incident, if known." 34 C.F.R. 106.45(b)(2). That written notice "must include a statement that the respondent is presumed not responsible for the alleged conduct" and must be amended if additional allegations are made later in the proceeding. 34 C.F.R. 106.45(b)(2).

72.    The Title IX regulations effective August 14, 2020, require that the university or college conduct investigations that:

(i)     "Ensure that the burden of proof and the burden of gathering evidence sufficient to reach a determination regarding responsibility rest on the recipient and not on the parties," 34 C.F.R. 106.45(b)(5)(i);

(ii)    "Provide an equal opportunity for the parties to present witnesses, including fact and expert witnesses, and other inculpatory and exculpatory evidence," 34 C.F.R. 106.45(b)(5)(i);

(iii)   "Not restrict the ability of either party to discuss the allegations under investigation or to gather and present relevant evidence,," 34 C.F.R. 106.45(b)(5)(iii);

(iv)    "Provide the parties with the same opportunities to have others present during any grievance proceeding, including the opportunity to be accompanied to any related meeting or proceeding by the advisor of their choice, who may be, but is not required to be, an attorney," 34 C.F.R. 106.45(b)(5)(iv);

(v)     "Provide, to a party whose participation is invited or expected, written notice of the date, time, location, participants, and purpose of all hearings, investigative interviews, or other meetings, with sufficient time for the party to prepare to

participate," 34 C.F.R. 106.45(b)(5)(v);

(vi)     "Provide both parties an equal opportunity to inspect and review any evidence obtained as part of the investigation that is directly related to the allegations raised in a formal complaint, including the evidence upon which the recipient [university or college] does not intend to rely in reaching a determination regarding responsibility and inculpatory or exculpatory evidence whether obtained from a party or other source" and "[p]rior to completion of the investigative report, the recipient [university or college] must send to each party and the party's advisor, if any, the evidence subject to inspection and review in an electronic format or a hard copy, and the parties must have at least 10 days to submit a written response, which the investigator will consider prior to completion of the investigative report," 34 C.F.R. 106.45(b)(5)(vi);  and

(vii)    "[c]reate an investigative report that fairly summarizes relevant evidence and, at least 10 days prior to a hearing . . . send to each party and the party's advisor, if any, the investigative report in an electronic format or a hard copy, for their review and written response," 34 C.F.R. 106.45(b)(5)(vii).

73.     Despite a different direction formally effected by the prior White House Administration, colleges and universities mostly continued with practices and policies in place created to comply with the April 2011 Dear Colleague Letter leading to gender biased enforcement of Title IX and avoided application of the Title IX regulations that went into effect on August 14, 2020. RIT was one such institution.

E.     **RIT's Title IX Program and Anti-Male Bias**

74.     As set forth in more detail below, RIT has adopted policies and procedures that favor students who file complaints of sexual misconduct and deny fundamental protections to accused students and trains its officials to assume complaints of sexual misconduct are valid.

75.     RIT is aware that almost all persons who file complaints of sexual misconduct are female and almost all of the accused students are males.

76.     Based on statements by college officials, the pressure from the federal government to adopt "victim"-centered, trauma-informed approaches, and the conduct and statements of the university decision makers in John's disciplinary proceeding, it is clear that RIT trains its Title IX personnel in accordance with the federally-funded "Start by Believing" model. RIT has touted that it provides "trauma-informed" training to its investigators and adjudicators. The "trauma-informed" approach presumes that allegations made by a complainant occurred,

focuses on a complainant's thoughts and feelings in determining whether alleged conduct was sexual harassment or assault, make credibility determinations based on presumptions about complainants and respondents generally and not on the evidence in a specific case, and disregards fair process protections for the accused.

77.     "Trauma-informed" techniques are based on pseudoscience, allow authority figures to encourage alleged victims to create exaggerated or false memories, and unjustly undermine the accused's ability to defend against allegations. Investigators are taught that an alleged victim's inability to recall crucial events and changing stories should not raise doubts about the veracity of an allegation but should instead be viewed as evidence that an assault occurred.

**F.     The Relationship of John Doe and Jane Roe**

78.     According to John Doe, in late 2019, Jane Roe and John Doe, both students at RIT, met via an online dating app, they had consensual sexual intercourse the first night they spent time together, they became good friends, and they would FaceTime occasionally. John Doe and Jane Roe had a "friend with benefits" relationship that fizzled out to being just friends. They did have sexual intercourse 4-6 times, and it was unquestionably consensual. On some of those occasions, Jane Roe made the first move, sometimes without asking John Doe directly for consent, and on some of those occasions, John Doe made the first move. According to Jane Roe, starting in January 2020, Jane Roe and John Doe started seeing each other and

would occasionally have consensual sexual intercourse. Also, according to Jane Roe, John Doe would ask Jane Roe about having a relationship.

79.     In April 2020, Jane Roe told John Doe that she (Jane Roe) had feelings for him and wanted a relationship. John Doe, however, said he did not feel the same way, and he subsequently dated someone else.

**G.     The Night of July 3-4, 2020**

80.     The week before the night of July 3, 2021, John Doe was living at the Province apartments right outside of RIT, and Jane Roe, after having completed her freshman year, was living at home. That week, Jane Roe was talking to John Doe on FaceTime and said that she and two friends were renting an Airbnb for the July 4th weekend in Rochester. John Doe said that it was cool, then asked if Jane Roe would want to hang out that weekend. Jane Roe said yes, and so John Doe and Jane Roe made plans to hang out on July 4th. During the disciplinary proceeding, Jane Roe falsely denied that John Doe and Jane Roe discussed hanging out together July 4th Weekend.

81.     On the night of July 3, 2021, it was around 11 pm when John Doe got a phone call from Jane Roe. She was drinking with her friends at a bar on East Ave in Rochester. Instead of requesting an Uber and spending more money, Jane Roe called John Doe right when he was about to go to sleep and asked John Doe to pick up Jane Roe and her friends. As the good friend he was, John Doe said yes. Then he

got up and drove down to East Ave to pick up Jane Roe and her friends just a few minutes later.

82.    When John Doe got to where Jane Roe and her friends had been drinking, they were on the side of the road waiting. John Doe could tell that Jane Roe's two friends were inebriated but that Jane Roe seemed perfectly fine. Jane Roe and her friends got into John Doe's car, and he drove off. As John Doe was driving, Jane Roe and her two friends tried convincing John Doe to stay with them and have a drink with them at the Airbnb. John Doe at first said no, but then agreed and said yes.

83.    When John Doe, Jane Roe and Jane Roe's two friends got to the Airbnb, John Doe parked his car in the back lot and went into the Airbnb Jane Roe and Jane Roe's two friends. John Doe's intention was to have a few drinks, then go home when he was good enough to drive. John Doe, Jane Roe and Jane Roe's two friends went up to the room and had a drink, and Jane Roe gave John Doe looks that indicated personal interest. Then, another friend of Jane Roe, a male with whom she had been having sexual intercourse and with whom Jane Roe would have sexual intercourse the night after the alleged incident, asked John Doe, Jane Roe and Jane Roe's two friends to come over to his place right down the street from the Airbnb. Jane Roe and Jane Roe's two friends wanted to go, so John Doe said that he would go too, and so they went.

84.     At the place of Jane Roe's male friend, there was a good party at which all present seemed to be having a good time. At the party, Jane Roe continued to keep giving John Doe looks that John Doe perceived as indicting personal interest. Jane Roe told John Doe that she was worried about John Doe's safety driving back to his place after having had the drinks he had.  John Doe told her that he wanted to drive home, but Jane Roe was adamant on not letting John Doe drive home that night. John Doe acquiesced and agreed to stay over. John Doe and Jane Roe then discussed where he would sleep since the Airbnb was small, and she suggested her blow up mattress.

85.     John Doe, Jane Roe and Jane Roe's two friends all went back to the Airbnb at around 3 am and all got ready to go to bed. John Doe was wearing black khaki shorts and a shirt. Meanwhile, Jane Roe was wearing her underwear and a shirt. John Doe and Jane Roe got into the same bed together. When the lights went out, John Doe saw Jane Roe looking at him like she wanted to do something sexually. They made eye contact for a few seconds, then John Doe kissed Jane Roe. Jane Roe did not push John Doe away, did not say stop, did not try to wake up her friends for help. Instead, Jane Roe kissed John Doe back and gave the appearance of enjoying what was happening.

86.     After kissing for a time, John Doe put his hand on Jane Roe's leg and stroked it up and down, basically asking by action if Jane Roe wanted to do more. It

was an action that John Doe had taken in the past with Jane Roe. If Jane Roe had pushed John Doe's hand away, then he would have known the answer was no. But Jane Roe did not do so, but rather acted in the same way she had before when John Doe and Jane Roe had engaged in sexual intercourse.

87.     Then, while still kissing, John Doe slid his hand up to her vagina and started penetrating it, to which Jane Roe consented. After John Doe finished that action, Jane Roe reached into John Doe's pants and started stroking his penis, to which he helped her out by unbuckling his belt and the top of his pants. After that action by Jane Roe, John Doe got on top of Jane Roe and kissed her some more. But then John Doe looked up and realized that Jane Roe's friends were right next to them. John Doe asked Jane Roe if she wanted to go to the bathroom to continue what they were doing bathroom, so they did not wake up the others in the Airbnb and Jane Roe said yes. John Doe buttoned up his pants at this point because he didn't want anyone seeing him naked or with his pants falling down.

88.     John Doe and Jane Roe went to the bathroom together. Jane Roe walked in the bathroom first. John Doe went to the refrigerator to get a bottle of water. When John Doe entered the bathroom, John Doe and Jane Roe started kissing. John Doe asked Jane Roe if she wanted to have sexual intercourse on the floor, but Jane Roe said no because the floor was gross looking. John Doe asked Jane Roe if she wanted to sit up on the counter, and Jane Roe did and the two resumed kissing. Later, Jane

Roe accused John Doe at this point of trying to insert his penis into her vagina, but John Doe adamantly denied that accusation, noting that he never took off his pants in the bathroom. After being in the bathroom for about five minutes, Jane Roe gave John Doe a light tap and said that she couldn't do this anymore because John Doe had a girlfriend and she didn't want to be in the shoes of John Doe's girlfriend someday. John Doe said OK, and all sexual activity stopped. John Doe and Jane Roe then we went to bed together. There, according to Jane Roe, John Doe told her he loved her, which he did but Jane Roe left out that John Doe said he loved her as a friend. The two then slept together until the morning.

**H.**   **July 4-July 31, 2020**

89.   The next morning (July 4, 2020), John Doe woke up and had a normal conversation with Jane Roe. Nothing that was said then that indicated any problem. John Doe went back to his apartment, while Jane Roe and her friends went to go to her family get together. Jane Roe was fine the entire day.

90.   Later that day (July 4, 2020), when Jane Roe and John Doe hung out together, Jane Roe was fine, which is reflected in the pictures taken at that time. At John Doe's apartment while waiting for the uber, Jane Roe pulled John Doe aside and said that she was uncomfortable with John Doe's cheating on his girlfriend. John Doe said that he was sorry and felt bad about it as well, and John Doe asked Jane

Roe not to tell anyone what happened because he didn't want anyone knowing about it, especially his girlfriend.

91.    Later in the week, when John Doe and Jane Roe were FaceTiming, Jane Roe told John Doe he should tell his girlfriend. John Doe said no because he wasn't ready. For the next several weeks, every other day, Jane Roe badgered John Doe that he should tell his girlfriend about what had happened. In texts, Jane Roe said she should have said no earlier and what happened was partly her fault.

92.    In late July 2020, Jane Roe sent John Doe's girlfriend an Instagram message telling the girlfriend what had happened at the Airbnb between Jane Roe and John Doe. The girlfriend confronted John Doe about what had happened at the Airbnb between Jane Roe and John Doe, and John Doe told her. The girlfriend requested that John Doe block Jane Roe on social media, which John Doe did. Jane Roe responded by messaging John Doe on his laptop saying it did not take long for him to block her. John Doe then deleted all messages from Jane Roe and blocked Jane Roe on his laptop as well.

I.    **March 15, 2021: Jane Roe Files University Complaint**

93.    John Doe heard nothing further from Jane Roe for almost eight months later, when on March 15, 2021, Jane Roe filed a university complaint with RIT's Title IX office accusing, falsely, John Doe of non-consensual sexual misconduct on the night of July 3, 2020. Jane Roe filled out an RIT sexual assault form online, and

in the form, indicated she would feel more comfortable speaking with someone rather than writing a complaint.

94.     Jane Roe met with an RIT Title IX Assistant Director and told the RIT Title IX Assistant Director that she and John Doe previously had a "friends with benefits" sexual relationship and that after a night of drinking with friends and John Doe, she and her friends told John Doe he ought not drive home and should stay with them. To the RIT Title IX Assistant Director, Jane Roe told John Doe that he could stay in her bed but that she (Jane Roe) had no desire to do anything sexual. To the RIT Title IX Assistant Director, Jane Roe said that as soon as the lights went out, John Doe started to touch her without her consent and kiss her, to which she said to stop. To the RIT Title IX Assistant Director, Jane Roe said that John Doe fingered her vagina, to which she said she told John Doe to stop, after which John Doe got on top of her and tried to push her clothing to the side. To the RIT Title IX Assistant Director, Jane Roe said that John Doe got up, asked Jane Roe to go to the bathroom with him and she did. To the RIT Title IX Assistant Director, Jane Roe said that John Doe asked her to perform oral sex, which she refused to do, and then asked her to lie on the floor, which she refused to do and instead left the bathroom and returned to her bed.

**J.**    **March 16, 2021 – April 21, 2021: Investigation**

95.    On March 16, 2021, Jane Roe approved proceeding with a formal investigation.

96.    On March 17, 2021, the investigator interviewed Jane Roe, and on March 18, 2021, Jane Roe made a written statement of fact. Jane Roe, in speaking with the investigator and making her written statement, told a slightly different story in the details. Jane Roe acknowledged that she and John Doe previously had a sexual relationship, that she was intoxicated the night of July 3-4, 2020, that after a night of drinking with friends and John Doe, she told John Doe he could sleep in her bed, as John Doe had been drinking and she did not want John Doe driving under the influence of alcohol and that the two would just cuddle. According to Jane Roe's story to the investigator, John Doe and she initially slept, but John Doe woke her up around 3:30 am and started to kiss her and hug her, to which Jane Roe said no, and John Doe put her hand on his penis. Also, according to Jane Roe's complaint, John Doe fingered her vagina, to which she said she told John Doe to stop, after which John Doe got up to go to the bathroom and motioned Jane Roe to follow, which she did. In the bathroom, according to Jane Roe, she was forced to perform oral sex on John Doe until she pushed John Doe away. But then, said Jane Roe, John Doe lifted her up on to the bathroom counter and unsuccessfully attempted to penetrate her with his penis. According to Jane Roe, she was able to get away and leave the bathroom.

According to Jane Doe's account, both John Doe and Jane Roe then returned to her bed, talked for a brief time; no further sexual activity occurred.

97.     Jane Roe, in speaking with the investigator, also said that the next day, she told John Doe she was not comfortable with what had happened, that in late July 2020, she told John Doe's girlfriend about what had happened, and that John Doe thereafter blocked her on social media.

98.     Also on March 17, 2021, a "No Contact Order" ("NCO") with Notice of Investigation and Allegations was issued to all parties. John Doe received the NCO at 10:42 pm but did not read the part about not contacting Jane Roe, and at 10:57 pm sent a message "Hey" to Jane Roe, who complained about the violation of the NCO.

99.     On March 24, 2021, the investigator interviewed John Doe, and John Doe made a written statement of fact. To the investigator, John Doe said that Jane Roe called him the night of July 3, 2020, and asked John Doe to come pick her up along with her friends and take them to their Airbnb. Once there, Jane Roe's friends invited John Doe inside, where they all had a drink. The group then moved down the street to another friend's house where they all continued drinking. In the early morning hours of July 4, 2020, Jane Roe and John Doe agreed they would share a bed that night; and about 3:00 am, they returned to the Airbnb. So did Jane Roe's friends sharing the Airbnb.

100.   To the investigator, John Doe said that he and Jane Roe got into bed together where they made eye contact and began kissing with Jane Roe kissing back and not saying no, that John Doe fingered Jane Roe's vagina and Jane Roe put her hand on John Doe's penis and stroked it, that Jane Roe removed her hand and John Doe got on top of Jane Roe. To the investigator, John Doe said that at that point, John Doe asked if they should go into the bathroom, so they did not wake up the others in the Airbnb, John Doe went to the bathroom and Jane Roe followed him, climbing up on the bathroom counter, and in that position, the two started kissing some more. To the investigator, John Doe said that Jane Roe then pushed John Doe away and said she could not continue because John Doe had a girlfriend and would not want be in the girlfriend's shoes, and John Doe said OK and both got back in bed and went to sleep for the rest of the night.

101.   To the investigator, John Doe said that the next morning, John Doe had a normal conversation with Jane Roe with nothing that indicated any problem, but that later that day, Jane Roe told John Doe that she (Jane Roe) felt bad about what had happened and later in the week, when John Doe and Jane Roe were FaceTiming, Jane Roe told John Doe he should tell his girlfriend. To the investigator, John Doe said that in late July 2020, Jane Roe sent John Doe's girlfriend an Instagram message telling the girlfriend what had happened at the Airbnb between Jane Roe and John Doe, the girlfriend confronted John Doe about what had happened at the Airbnb

between Jane Roe and John Doe, John Doe told her, the girlfriend requested that John Doe block Jane Roe on social media, which John Doe did. To the investigator, John Doe said that Jane Roe responded by messaging John Doe on his laptop saying it did not take long for him to block her, after which John Doe then deleted all messages from Jane Roe and blocked Jane Roe on his laptop as well.

102.   On April 16, 2021, the investigator interviewed "Witness 1," who was one of Jane Roe's friends at the Airbnb. According to Witness 1, she was asleep and did not see or hear the alleged incident, but the next day, Jane Roe told her that John Doe had touched her inappropriately, but she was fine.

103.   The investigator also collected documents, including the initial online report by Jane Roe, the Notice of Investigation and Allegations, Jane Roe's Statement of Fact, John Doe's Statement of Fact, and screenshots.

104.   RIT's Title IX office issued a report dated April 21, 2021, that summarized the statements by John Doe, Jane Roe, and one of Jane Roe's friends, identified the uncontested information and the contested information, and collected documentary evidence such as screenshots.

105.   RIT's Title IX Office determined that a hearing was warranted whether John Doe engaged in non-consensual sexual contact and non-consensual sexual intercourse with Jane Roe in the early morning hours of July 4, 2020.

**K.**   **May 24, 2021: First Hearing**

106.   On May 24, 2021, a hearing was held before two Hearing Officers. At the hearing, both John Doe and Jane Roe made presentations, giving their conflicting stories about the night of July 3-4, 2020, that had been given to the investigators. Among other things, Jane Roe said John Doe was naked and she said no when John Doe put his hand down her pants and fingered her, whereas John Doe stated that he always had his clothes on because there were others on the Airbnb; and John Doe stated what sexual contact he had with Jane Roe was consensual based on his prior consensual sexual experience with her and how she acted, including her putting her hand on his penis, was consistent with that prior consensual sexual experience.

**L.**   **May 28, 2021: First Hearing Board Decision**

107.   On May 28, 2021, RIT's Title IX Office sent a letter by e-mail to John Doe informing him that the Hearing officers ruled that John Doe had engaged in non-consensual sexual contact but not non-consensual sexual intercourse with Jane Roe on July 4, 2020, and that John Doe was put on probation until July 5, 2021.

108.   The finding of John Doe's responsibility for non-consensual sexual contact was premised on finding that before going into the bathroom, there was no consent for John Doe to have engaged in the sexual touching of Jane Roe in bed for sexual gratification and arousal. The Hearing Officers noted Jane Roe's stated expectation of no sex when sharing a bed with John Doe and that John Doe said he

believed, based on his prior sexual experiences with Jane Roe, he had mutual consent from her kissing him back and having her hands on his body. In fact, John Doe had made the point that it was not just the prior consensual sexual intercourse that informed his belief he had consent, but also how Jane Roe acted that night, that after John Doe fingered Jane Roe's vagina, Jane Roe reached into John Doe's pants and stroked his penis. Yet, the Hearing Officers concluded that the preponderance of the evidence supported there was no consent for the sexual contact in the bed.

109.   The finding of John's non-responsibility for non-consensual sexual intercourse was premised on the fact that there were two episodes of sexual activity discontinuing following consent being rescinded, which denoted John Doe had awareness and responsiveness to consent regarding sexual intercourse. The two indications of consent being withdrawn were when (according to Jane Roe's story) Jane Roe purportedly said no to being fingered and stopping kissing when in the bathroom.  The Hearing Officers noted John Doe's statements that he would not have been naked because there were other people in the Airbnb, that he did not seek to force oral sex on him, that he did not pick up Jane Roe and put her on the bathroom counter and that there was no further sexual activity after Jane Roe said no in the bathroom.

110.   The Hearing Officers determined that John Doe was to be put on probation until July 5, 2021, to be subject to a No Contact Order with respect to Jane

Roe, to attend a "Consent and Respect" seminar at the Center for Women and Gender, and to attend a "Relationships and Boundaries" seminar at the Center for Women and Gender.

**M.    July 12, 2021: John Doe's First Appeal and First Appeal Decision**

111.   On June 3, 2021, John Doe appealed, and on June 11, 2021, John Doe submitted additional evidence of screenshots of texts and identification of additional witnesses. Jane Roe also appealed the first Hearing Officers' decision.

112.   On July 12, 2021, it was determined that the case would be re-heard because new information which was not known or available at the time of the first hearing, including relevant text messages from a witness that John Doe said supported his position that what sexual contact there was in the early morning hours of July 4, 2020 was consensual.

113.   On July 16, 2021, the investigator interviewed W2, who was present in the Airbnb the night of July 3-4, 2021 but who had not come forward earlier because W2 was afraid of Jane Roe retaliating against her. According to W2, Jane Roe never complained about John Doe's action, rather that Jane Roe said she enjoyed the sexual contact with John Doe but felt guilty because John Doe had a girlfriend. Jane Roe continued to invite John Doe to join with her and her friends at other outings. According to W2, Jane Roe said she and John Doe did not go any further than oral sex because John Doe has a girlfriend and that the oral sex wasn't bad. According to

44

W2, Jane Roe was obsessed with John Doe and was determined to tell John Doe's girlfriend that John Doe had cheated on her with Jane Roe. One of the screenshots showed Jane Roe saying she could not let John Doe's girlfriend think John Doe is a good person. E-mails from W1, W3 and W4, roommates of Jane Roe, all said that W2 was not credible because W2 was trying to undermine Jane Roe's case given the falling out of Jane Roe and W2.

114.   During this time of collecting additional evidence, the investigator asked Jane Roe why she did not report it earlier, and Jane Roe said she suppressed her emotions but after seeing a counselor, she knew she wanted to report it. Jane Roe also denied making the oral sex comment to W2.

## N.   <u>September 3, 2021: Second Hearing</u>

115.   On September 3, 2021, a second hearing was held by Zoom with two RIT Title IX officer Hearing Officers. At the Hearing, both John Doe and Jane Roe said they were not incapacitated and reiterated what they had told the investigators. John Doe stated what sexual contact he had with Jane Roe was consensual based on how she acted affirmatively approving of the sexual conduct consistent with their prior consensual sexual experiences. John Doe stated that when he fingered Jane Roe, she responded in a way that reflected past experience of her enjoying it and that Jane Roe put her hand on John Doe's penis. Jane Roe denied she gave consent to what she said were the sexual contact and the unsuccessfully attempted sexual

intercourse in the bathroom.

**M.   September 9, 2021: Second Hearing Board Decision**

116.   On September 9, 2021, RIT's Title IX Office sent a letter by e-mail to John Doe informing him that the Hearing officers ruled that John Doe had engaged in non-consensual sexual contact and non-consensual sexual intercourse with Jane Roe on July 4, 2021, that John Doe had violated the No Contact Order and that, among other things, John Doe was suspended effective immediately and to continue to the Fall semester 2022.

117.   According to the September 9, 2021 letter of RIT's Title IX office, the Hearing officers focused on whether John Doe had consent, which the September 9, 2021 letter described as John Doe relying upon his prior sexual experience with Jane Roe to cause him to believe that he had consent, that Jane Roe did not say no or push John Doe away. The Hearing Officers noted that John Doe said he invited Jane Roe to go into the bathroom to continue sexual activity, that Jane Roe said she did not know John Doe's intentions when she followed him in, and that after John Doe unsuccessfully tried to penetrate Jane Roe's vagina with his penis, Jane Roe left the bathroom. The Hearing Officers cited John Doe's statements that the only time Jane Roe said no was in the bathroom, after which John Doe stopped all sexual activity, then cited RIT Policy stating that affirmative consent was required and that silence or lack of resistance in and of itself does not demonstrate consent and then cited John

Doe's statements that consent to the kissing, touching, digital penetration of Jane Roe's vulva, oral sex performed by Jane Roe, and attempted penetration of Jane Roe's vagina with John Doe's penis was based on John Doe's prior sexual experience with Jane Roe. John Doe, however, had not stated that oral sex was performed by Jane Roe and that he had attempted penetration of Jane Roe's vagina with his penis.

118.   The September 9, 2021 letter reflected that the Hearing Officers credited Jane Roe's account and did not accept John Doe's account.

119.   The Hearing Officers concluded that John Doe did not have consent because affirmative consent was not provided by prior sexual history and that John Doe was responsible for non-consensual sexual contact and non-consensual sexual intercourse with Jane Roe on July 4, 2021, and further that John Doe had violated the No Contact Order. These findings differed for the first Hearing Officers' decision that did not find John Doe responsible for non-consensual sexual intercourse with Jane Roe on July 4, 2021, and did not find John Doe responsible for what was an unintentional and inconsequential violation of the No Contact Order when it was first issued. The Second Hearing Offices disregarded the portion of John Doe's statements referring to actions by Jane Roe evidencing consent such as Jane Roe putting her hand on John Doe's penis when John Doe fingered Jane Roe's vagina.

120.   With respect to the Hearing evidence, John Doe's statements to the investigators and at the Hearings denied any sexual activity in the bathroom beyond kissing. Jane Roe's statements to the investigators and at the Hearings had indicated that the effort at sexual intercourse in the bathroom failed. Jane Roe's statements when she made her complaint did not include any accusation that John Doe had attempted sexual intercourse in the bathroom. Further, there was never any medical and/or DNA evidence produced by Jane Roe that supported that there had been penile sexual intercourse. The conclusion of the first Hearing Officers that the preponderance of the evidence showed that John Doe was not responsible for non-consensual sexual intercourse was rationally based upon the evidence because it took account of Jane Roe's actions in bed such as putting her hand on John Doe's penis. The conclusion of the second Hearing Officers that John Doe was responsible for non-consensual sexual intercourse was based upon an uncritical acceptance of Jane Roe's account denying consent when John Doe has her putting her hand on John Does penis. The finding of non-consensual sexual intercourse was essential to the second Hearing Officers' determination to impose a harsher sanction on John Doe.

121.   The second Hearing Officers determined that John Doe would be suspended taking effect immediately and continuing until the Fall semester 2022, subject to a No Contact Order with respect to Jane Roe, to attend a "Consent and Respect" seminar at the Center for Women and Gender, and to have "meaningful

48

life experience" in six months of employment or substantial community service and six months of personal counseling.

122.   The sanction imposed by the second Hearing Officers harsher than what the first Hearing Officers had imposed -- a suspension instead of a probation and a requirement of six months of employment or substantial community service and six months of personal counseling.

## N.   October 12, 2021: John Doe's Second Appeal and Second Appeal Decision

123.   John Doe timely appealed the second Hearing Board decision. While John Doe appeared before the Appeal Board and argued that the Hearing Officers had unjustifiably believed Jane Roe given the additional new evidence undercutting the credibility of Jane Roe and that the sanction was unduly severe, Jane Roe only submitted a written statement, denying there was consent in the silence on her part, denying a vindictive motive and supporting the second Hearing Officers' decision. Jane Roes statement included the claim that "First, even if I did kiss him back, that is still not verbal consent." The second Hearing Officers were questioned by the Appeal Board whether what John Doe had done warranted the sanction the second Hearing Officers had determined, and they said it did. The Hearing Officers said, however, that had John Doe explained at the hearing why he believed he had consent as well as he had in the appeal, they might have found consent.

124.   On October 12, 2021, the RIT Title IX office issued a letter to John Doe informing him that the September 9, 2021 Hearing Decision and sanctions were upheld on the ground that John Doe's own statements established the standard of affirmative consent was not met. The RIT Title IX office's October 12, 2021 letter did not address what constituted the non-consensual sexual intercourse, did not explain how the second Hearing Officers could properly credit Jane Roe given the new additional evidence, did not justify the harsher sanction from the second Hearing, and did not justify the harsh sanction that was imposed upon John Doe relative to other university sexual misconduct complaints. According to the 2021 RIT Annual Report on Sex Discrimination, as to the fourteen university sexual misconduct complaints at RIT, only two resulted in suspension. This case involved sexual conduct between John Doe and Jane Roe who had a prior consensual sexual history, John Doe believed he had Jane Roe's consent again, and John Doe stopped all sexual activity once Jane Roe said "no" in the bathroom of the Airbnb.

### FIRST CAUSE OF ACTION:
### (Violation of Title IX of the Education Amendments of 1972)

125.   John Doe repeats and re-alleges each and every allegation hereinabove as if fully set forth herein.

### A.   Title IX and Its Application

126.   20 U.S.C. § 1681(a), provides in relevant part that:

No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance.

127.   Title IX of the Education Amendments of 1972 applies to an entire school or institution if any part of that school receives federal funds; hence, athletic programs are subject to Title IX of the Education Amendments of 1972 even though there is very little direct federal funding of an activity such as school sports.

128.   RIT has received and continues to receive over $111 million in annual federal funding federal funding in the last two years and accordingly has maintained a Title IX office as part of the school.

129.   Title IX may be violated by a school's failure to prevent or remedy sexual harassment or sexual assault, *Davis v. Monroe Bd. of Education*, 526 U.S. 629 (1999), or by the imposition of university discipline where gender is a motivating factor in the decision to discipline, *Yusuf v. Vassar College*, 35 F.3d 709, 715 (2d Cir. 1994). In either case, the statute is enforceable through an implied private right of action.

130.   Title IX's non-discrimination provision applies to the recipient RIT regardless of whether the school purports to apply Title IX procedures or other procedures in a disciplinary proceeding. Students discriminated against on the basis of sex by a school's disciplinary measures applied to the student have a claim under Title IX.

**B.**     **Title IX Challenges to University Disciplinary Proceedings**

131.   Challenges   to   university   disciplinary   proceedings   for   sex

discrimination in the Second Circuit generally fall in two categories: (1) "erroneous

outcome" cases, in which the claim is that there is substantial reason to doubt that

the plaintiff was guilty of the offense and gender bias was a motivating factor behind

the erroneous findings; and (2) "selective enforcement/undue severity" cases, in

which the claim asserts that, regardless of the student's guilt or innocence, the

severity of the penalty and/or decision to initiate the proceeding was affected by the

student's gender. *Yusuf v. Vassar College*, 35 F.3d 709, 715 (2d Cir. 1994).

132.   An "erroneous outcome" occurred in this case because John Doe was

wrongly found responsible for non-consensual sexual behavior and the totality of

the   circumstances   establish   gender   bias   was   a   motivating   factor.   "Selective

enforcement/undue severity" occurred in this case because John Doe received a

harsher sanction from the second Hearing Officers in comparison to the first Hearing

Officers.

133.   In *Menaker v. Hofstra*, 935 F.3d 20, 34 (2d Cir. 2019), the Second

Circuit identified "irregularities" that pointed to gender bias:

> [W]e need not define precisely what sort of irregularities meet the
> standard of "clearly irregular investigative or adjudicative process."
> But we note that *Doe v. Columbia* [, 831 F.3d 46, 57 (2d Cir. 2016),]
> offers some guidance on this issue. For instance, "[w]hen the evidence
> substantially favors one party's version of a disputed matter, but an
> evaluator forms a conclusion in favor of the other side (without an

apparent reason based in the evidence), it is plausible to infer (although by no means necessarily correct) that the evaluator has been influenced by bias."

134.   The second Hearing Officers made a finding of John Doe being responsible for non-consensual sexual intercourse when that finding required an uncritical acceptance of Jane Roe's account and a disregarding of John Doe's statements describing Jane Roe's actions manifesting consent. There was a "believe the woman" bias evidenced in the second Hearing Officers' decision that resulted in John Doe being discriminated against on the basis of sex.

135.   The totality of the circumstances establish that RIT discriminated unlawfully under Title IX in reaching the "erroneous outcome." RIT credited a false accusation of sexual misconduct, presumed that those allegations to be true rather than properly applying the preponderance of the evidence standard and required no reasoned consideration of evidence as required by a burden of proof.

136.   In *Doe v. Univ. of Arkansas - Fayetteville*, 974 F.3d at 864-866, the Eighth Circuit upheld the Complaint because the disciplinary decision was against the substantial weight of evidence, the sanction did not match the alleged violation, and the university faced external pressure to aggressively pursue complaints against males. In support of the statement that "External pressure on a university to demonstrate that it acted vigorously in response to complaints by female students may support an inference that a university is biased based on sex, although not

necessarily in a particular case," the Eighth Circuit cited a list of cases: *Doe v. Baum*, 903 F.3d 575, 585-86 (6th Cir. 2018), *Doe v. Miami*, 882 F.3d 579, 592-93 (6th Cir. 2018), *Doe v. Columbia*, 831 F.3d 46, 57 (2d Cir. 2016), *Yusuf v. Vassar College*, 35 F.3d 709 715 (2d Cir. 1994), and *Doe v. Purdue*, 928 F.3d 652, 668-669 (7th Cir. 2019).

137.   The 2011 Dear Colleague Letter "provides a backdrop that, when combined with other circumstantial evidence of bias in [a] specific proceeding, gives rise to a plausible claim." *Doe v. Purdue*, 928 F.3d at 669, quoting *Doe v. Baum*, 903 F.3d 575, 586 (6th Cir. 2018).

138.   As noted above, the primary focus of the 2011 Dear Colleague Letter was to protect women from sexual misconduct cases. As also noted above, the 2011 Dear Colleague Letter effectively required, through the threat of cutting off federal funding, colleges and universities, including RIT, to adopt disciplinary procedures for sexual misconduct allegations that conformed to the 2011 Dear Colleague Letter. Notwithstanding the fact that the 2011 Dear Colleague Letter was rescinded in 2017, the 2011 Dear Colleague Letter still has great relevance here because RIT continued to apply the procedures of the old regulatory regime in this case and not the new Title IX regime reflected in the Title IX regulations that went into effect starting August 14, 2020.

139.   RIT has created a victim-centered process in which an accused male student is prosecuted under a presumption of guilt, improperly placing the burden of proof on the male respondent in many cases. This one-sided process has deprived John Doe, as a male student, of the benefits of his education at RIT which has exhibited a distinctly consistent pattern of decision-making against a male party and in favor of a female party and evaluates evidence according to gender biased assumptions to reach results finding males "responsible" to achieve "justice" according to "gender identity politics."

140.   RIT adopted policies and procedures favoring students who file complaints of sexual misconduct and denying fundamental protections to accused students; RIT trains its officials to assume complaints of sexual misconduct are valid; RIT provides support services for complainants; RIT is aware that almost all persons who file complaints of sexual misconduct are female and almost all of the accused students are males; trauma-informed techniques based on pseudoscience allow authority figures to encourage alleged victims to create exaggerated or false memories; investigators are taught that an alleged victim's inability to recall crucial events and changing stories should not raise doubts about the veracity of an allegation; the phrase "believe all women" means that when a female accuses a male of sexual misconduct, she is a "survivor" and her accusations are presumptively true. Cases recognize allegations of trauma-investigation techniques give rise to an

inference of gender bias. *Norris v. Univ. of Colorado, Boulder*, 362 F.Supp.3d 1001, 1013 (D. Colo. 2019); *Doe v. Syracuse*, 2019 WL 2021026 (N.D.N.Y. May 8, 2019); *Doe v. Syracuse*, 2020 WL 2513691 (N.D.N.Y. May 15, 2020).

141.   ''A covered university that adopts, even temporarily, a policy of bias favoring one sex over the other in a disciplinary dispute, doing so in order to avoid liability or bad publicity, has practiced sex discrimination, notwithstanding that the motive for the discrimination did not come from ingrained or permanent bias against that particular sex.'' *Doe v.* Purdue, 928 F.3d at 668, quoting *Doe v. Columbia*, 831 F.3d 46, 58 n.11 (2d Cir. 2016). "There is nothing implausible or unreasonable about the Complaint's suggested inference that the panel adopted a biased stance in favor of the accusing female and against the defending male varsity athlete in order to avoid further fanning the criticisms that Columbia turned a blind eye to such assaults." *Doe v. Purdue*, 928 F.3d at 668, quoting *Doe v. Columbia*, 831 F.3d at 58.

142.   The Hearing Officers failed to making clear the role of an advisor and whether or not John Doe or his advisor could cross-examine witnesses and object to evidence and the Hearing Officers' failure for not questioning Jane Doe about her belated accusations. These failures were part and parcel of RIT's conducting the hearing not under the new Title IX regulations that were in effect at the time of Jane Roe's complaint, the investigation, the hearing and the Hearing Officers' decisions.

143.   The anti-male gender biased nature of the sexual misconduct disciplinary proceedings against John Doe was reflected in the failure throughout the process to examine the motives and circumstances of Jane Roe. One primary reason for that dereliction was anti-male gender bias.

144.   The anti-male gender biased nature of the sexual misconduct disciplinary proceedings against John Doe was reflected in a disproportionate sanction. John Doe, who had no prior disciplinary history and who believed he had consent for the sexual conduct that occurred, was suspended effectively immediately and subject to other requirements. The disproportionate sanction reflects a gender biased belief that males need to be sanctioned severely for sexual misconduct. Gruber, *Anti-Rape Culture*, 64 U. Kansas L. Rev. 1027, 1030 (2016).

145.   The Hearing Officers and Appeal Boards disregarded the totality of circumstances surrounding John Doe's alleged conduct, among other facts: John Doe had no other disciplinary record; there was no use of force; the alleged misconduct occurred as a single, isolated incident; no one other than Jane Roe was affected by what happened the night of July 4, 2020 and thus there was no detriment to the health, safety and wellbeing of other members of the RIT community.

## D.   **Monetary and Injunctive Relief**

146.   As a direct and proximate result of the above conduct, John Doe sustained tremendous damages, including, without limitation, emotional distress,

damages to reputation, psychological damages, loss of educational and career opportunities, economic injuries and other direct and consequential damages.

147.   As a result of the foregoing, John Doe is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements and to an injunction enjoining violations of the Title IX in the process of investigating and adjudicating sexual misconduct complaints, ordering the ending of the suspension, enjoining RIT from preventing John Doe doing what is necessary to receive a bachelor's degree from RIT and granting clearing of John Doe's transcript of the disciplinary record.

## SECOND CAUSE OF ACTION:
### (State Law Breach of Contract)

148.   John Doe repeats and re-alleges each and every allegation hereinabove as if fully set forth herein.

149.   RIT created an express and/or implied contract under New York law when John Doe accepted an offer of admission to RIT and paid the tuition and fees.

150.   The Introduction to RIT's Gender-Based and Sexual Misconduct Policy makes clear that it is intended to be interpreted and applied consistently with Title IX.

151.   RIT's Gender-Based and Sexual Misconduct Policy thus intends that students have impartial investigators investigate the case, impartial hearing officers hear the case, and a fair and impartial disciplinary process in which it is the

responsibility of RIT to prove by a preponderance of the evidence that a violation has occurred before any sanctions are imposed. RIT breached its contract with John Doe when it failed to have impartial investigators and hearing officers to conduct a fair and impartial process that treated John Does and Jane Roes equally and when it failed to adhere to the preponderance of the evidence standard, with presumption of innocence of the respondent, including by not using the proper burden of proof standard, by effectively shifting the burden of proof to John Doe.

152.   Based on the aforementioned facts and circumstances, RIT breached its express and/or implied contract with John Doe because RIT breached and violated a covenant of good faith and fair dealing implied in the agreement(s) with John Doe. RIT failed its duty of good faith and fair dealing when it committed the procedural and substantive errors complained of above, meted out a disproportionate sanction notwithstanding the flawed process and found John Doe responsible despite the lack of evidence in support of Jane Roe's allegations of sexual misconduct.

153.   John Doe is entitled to recover damages for RIT's breach of the express and/or implied contractual obligations described above. As a direct and proximate result of the above conduct, John Doe sustained tremendous damages, including, without limitation, emotional distress, damages to reputation, psychological damages, loss of educational and career opportunities, economic injuries and other direct and consequential damages.

154.   As a result of the foregoing, John Doe is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements.

### THIRD CAUSE OF ACTION:
### (State Law Promissory Estoppel)

155.   John Doe repeats and re-alleges each and every allegation hereinabove as if fully set forth herein.

156.   RIT's various policies constitute representations and promises that RIT should have reasonably expected to induce action or forbearance by John Doe.

157.   RIT expected or should have expected John Doe to accept its offer of admission, incur tuition and fees expenses, and choose not to attend other colleges based on its express and implied promises that RIT would not tolerate, and John Doe would not suffer, harassment by fellow students and would not deny John Doe his procedural rights should he be accused of a violation of RIT Policies.

158.   John Doe relied to his detriment on these express and implied promises and representations made by RIT.

159.   Based on the foregoing, RIT is liable to John Doe based on estoppel.

160.   As a direct and proximate result of the above conduct, John Doe sustained tremendous damages, including, without limitation, emotional distress, psychological damages, loss of educational and athletic opportunities, economic injuries and other direct and consequential damages.

# PRAYER FOR RELIEF

**WHEREFORE,** for the foregoing reasons, John Doe demands judgment against RIT as follows:

(i)    on the first cause of action for violation of Title IX of the Education Amendments of 1972, a judgment against Luther College awarding John Doe:

    (a)    an injunction vacating the disciplinary findings and decision with respect to John Doe, ordering the records at RIT be amended to reflect that finding of responsibility against John Doe is reversed or withdrawn, ordering that the sanction of suspension be reversed and the disciplinary file containing the suspension and the suspension be expunged from all records and transcripts, ordering clearing of John Doe's transcript of the disciplinary record, ordering John Doe's undergraduate status be immediately returned to in "Good Standing," and any restrictions imposed upon him removed, and enjoining RIT from preventing John Doe doing what is necessary to receive a degree from Luther College; and

    (b)    damages in an amount to be determined at trial, including, without limitation, damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational and athletic opportunities, and loss of future career prospects, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements.

(ii)    on the second cause of action for state law breach of contract, a judgment against RIT awarding John Doe damages in an amount to be determined at trial, including, without limitation, damages to physical well-being, emotional and psychological damages, damages to

61

reputation, past and future economic losses, loss of educational and athletic opportunities, and loss of future career prospects, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements;

(iii)    on the third cause of action for state law promissory estoppel, a judgment against Luther College awarding John Doe damages in an amount to be determined at trial, including, without limitation, damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational and athletic opportunities, and loss of future career prospects, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements; and

(iv)    awarding John Doe such other and further relief as the Court deems just, equitable and proper.

## **JURY DEMAND**

Plaintiff John Doe demands a trial by jury of all issues presented herein that are triable by a jury.

Dated: December 28, 2021

Respectfully submitted,
NESENOFF & MILTENBERG LLP

By: __/s/ _Philip A. Byler_
Philip A. Byler, Esq.
Andrew T. Miltenberg, Esq.
363 Seventh Avenue, Fifth Floor
New York, New York 10001
(212) 736-4500
pbyler@nmllplaw.com
amiltenberg@nmllplaw.com

*Attorneys for Plaintiff John Doe*