**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF NEW YORK**
-------------------------------------------------------------x

JOHN DOE,                                            |      Case No. 6:21-cv-06761-FPG
                                                     |
              Plaintiff,                             |
                                                     |
      v.                                             |
                                                     |
ROCHESTER INSTITUTE OF                               |
TECHNOLOGY,                                          |
                                                     |
              Defendant.                             |
-------------------------------------------------------------x

## PLAINTIFF JOHN DOE'S OPPOSITION
## TO DEFENDANT RIT'S LOCAL RULE 56
## <u>STATEMENT OF MATERIAL FACTS</u>

Plaintiff John Doe, through counsel and per Local Rule 56 (a)(2), submits the

following opposition to Defendant RIT"s Local Rule 56(a)(1) Statement of Material

Facts:

### <u>The Parties</u>

1.      Admit.

2.      Admit.

3.      Admit, except adds that the administrative responsibilities of Ms.

Boulais included Title IX case appeals (Byler Decl. Ex. 9: Boulais Dep. 6).

4.       Admit.

5.      Admit, except adds that Ms. Smith-Schubart served as a panelist for the

second hearing in John Doe's case (Byler Decl. Ex. 8: Smith-Schubart Dep. 6).

6.      Admit.

7.      Admit.

8.     Admit, except corrects the new major was Computing Security.  (Byler Decl. Ex. 7: John Doe Dep. 8.)

9.     Denies, John Doe anticipated graduating in May 2022 but due to the gender biased suspension, graduated in May 2023. (Byler Decl. Ex. 7: John Doe Dep. 20.)

10.     Admit, except also admits that John Doe was a pitcher on the RIT baseball team, but due to the suspension, could not continue as a member of the RIT men's baseball team. (Byler Decl. Ex. 7: John Doe Dep. 13-14, 19; Byler Decl. Ex. 8: Smith-Schubart Dep. 72.)

11.     Admit.

12.     Admit.

13.     Admit.

14.     Admit.

15.     Admit.

**RIT Title IX Policies and Procedure**

16.     Denies, except admits (a) that RIT purports to maintain a Title IX Policy prohibiting sex based and sexual misconduct, including non-consensual sexual contact and non-consensual sexual intercourse and (b) that a policy and its correct application are two different things.  John acknowledged that RIT Policy contains a definition of affirmative consent to sexual activity that includes that consent can be given by words (verbal or signed) or actions that create permission for a person to engage in sexual activity.  But John's position was that he had consent for the sexual

activity on July 3-4, 2020 and stuck with that position through the appeal of the second outcome, saying he knew he had consent and never said he did not have consent.  (Byler Decl. Ex. 7: John Dep. 52, 100-107, 130; Byler Decl. Ex. 9: Boulais Dep. 57-58; John Decl. ¶¶ 14-17, 42; Byler Decl. Ex. 1 tr. 63, 65-66.)   Jane Roe admitted kissing back; Smith-Schubart acknowledged that consent does not require spoken words.  (Byler Decl. Ex. 8: Smith-Schubart Dep. 56-58; Byler Decl. Ex. 9: Boulais Dep. 40.) John's belief he had consent for the sexual contact he had: Jane Roe was looking at John like she did before when they had sexual relations AND Jane Roe was "perfectly engaged in it" as she had in prior sexual episodes with John AND Jane Roe had her hands all over John's body AND Jane Roe placed her hand on John's penis AND Jane Roe was kissing John back. (Byler Decl. Ex. 7: John Dep. 52, 100-107, 130; Byler Decl. Ex 1, tr. 63, 65, 66; John Decl ¶¶ 14-17.)  There was not "silence." (Byler Decl. Ex. 7: John Dep. 130-131.)

17.    Denies, except admits (a) that RIT Policy contains a definition of non-consensual sexual contact and (b) that a formal policy definition and its correct application are two different things.  John acknowledged that RIT Policy contains a definition of affirmative consent to sexual activity that includes that consent can be given by words (verbal or signed) or actions that create permission for a person to engage in sexual activity.  But John's position was that he had consent for the sexual activity on July 3-4, 2020 and stuck with that position through the appeal of the second outcome, saying he knew he had consent and never said he did not have consent.  (Byler Decl. Ex. 7: John Dep. 52, 100-107, 130; Byler Decl. Ex. 9: Boulais

Dep. 57-58; John Decl. ¶¶ 14-17, 42; Byler Decl. Ex. 1 tr. 63, 65-66.)   Jane Roe admitted kissing back; Smith-Schubart acknowledged that consent does not require spoken words.   (Byler Decl. Ex. 8: Smith-Schubart Dep. 56-58; Byler Decl. Ex. 9: Boulais Dep. 40.)   John's belief he had consent for the sexual contact he had: Jane Roe was looking at John like she did before when they had sexual relations AND Jane Roe was "perfectly engaged in it" as she had in prior sexual episodes with John AND Jane Roe had her hands all over John's body AND Jane Roe placed her hand on John's penis AND Jane Roe was kissing John back. (Byler Decl. Ex. 7: John Dep. 52, 100-107, 130; Byler Decl. Ex 1, tr. 63, 65, 66; John Decl ¶¶ 14-17.)   There was not "silence." (Byler Decl. Ex. 7: John Dep. 130-131.)

18.    Denies, except admits (a) that RIT Policy contains a definition of non-consensual sexual intercourse and (b) that a formal policy definition and its correct application are two different things – John did not engage in non-consensual sexual intercourse.   John acknowledged that RIT Policy contains a definition of affirmative consent to sexual activity that includes that consent can be given by words (verbal or signed) or actions that create permission for a person to engage in sexual activity. But John's position was that he had consent for the sexual activity on July 3-4, 2020, and stuck with that position through the appeal of the second outcome, saying he knew he had consent and never said he did not have consent.  (Byler Decl. Ex. 7: John Dep. 52, 100-107, 130; Byler Decl. Ex. 9: Boulais Dep. 57-58; John Decl. ¶¶ 14-17, 42; Byler Decl. Ex. 1 tr. 63, 65-66.)   Jane Roe admitted kissing back; Smith-Schubart acknowledged that consent does not require spoken words.  (Byler Decl. Ex. 8: Smith-

Schubart Dep. 56-58; Byler Decl. Ex. 9: Boulais Dep. 40.)  John's belief he had consent for the sexual contact he had: Jane Roe was looking at John like she did before when they had sexual relations AND Jane Roe was "perfectly engaged in it" as she had in prior sexual episodes with John AND Jane Roe had her hands all over John's body AND Jane Roe placed her hand on John's penis AND Jane Roe was kissing John back. (Byler Decl. Ex. 7: John Dep. 52, 100-107, 130; Byler Decl. Ex 1, tr. 63, 65, 66; John Decl ¶¶ 14-17.)  There was not "silence." (Byler Decl. Ex. 7: John Dep. 130-131.)

19.    Denies, except admits (a) that RIT Policy contains a definition of affirmative consent to sexual activity that includes that consent can be given by words (verbal or signed) or actions that create permission for a person to engage in sexual activity and (b) that a formal policy definition and its correct application are two different things -- John Doe had affirmative consent for the sexual activity on July 3-4, 2020.  (Byler Decl. Ex. 7: John Doe Dep. 100, 105-107, 130; John Decl.¶15.) John's belief he had consent for the sexual contact he had: Jane Roe was looking at John like she did before when they had sexual relations AND Jane Roe was "perfectly engaged in it" as she had in prior sexual episodes with John AND Jane Roe had her hands all over John's body AND Jane Roe placed her hand on John's penis AND Jane Roe was kissing John back. (Byler Decl. Ex. 7: John Dep. 52, 100-107, 130; Byler Decl. Ex 1, tr. 63, 65, 66; John Decl ¶¶ 14-17.)  There was not "silence." (Byler Decl. Ex. 7: John Dep. 130-131.)

20.    Denies, except admits that RIT Policy allows for suspensions from RIT campus and RIT campus activities and other bans in appropriate cases where the

preponderance of the evidence supports a charge warranting suspension – John denies that there was such preponderance of the evidence in his case. (Byler Decl. Ex. 7: John Doe Dep. 40-42.)  John's belief he had consent for the sexual contact he had: Jane Roe was looking at John like she did before when they had sexual relations AND Jane Roe was "perfectly engaged in it" as she had in prior sexual episodes with John AND Jane Roe had her hands all over John's body AND Jane Roe placed her hand on John's penis AND Jane Roe was kissing John back. (Byler Decl. Ex. 7: John Dep. 52, 100-107, 130; Byler Decl. Ex 1, tr. 63, 65, 66; John Decl ¶¶ 14-17.)   There was not "silence." (Byler Decl. Ex. 7: John Dep. 130-131.)

21.    Denies, except admits that RIT Policy, when read to him at the deposition, said what it did.  (Byler Decl. Ex. 7: John Dep. 41.)

22.    Denies, except admits that RIT Policy, when read to him at the deposition, said what it did.  (Byler Decl. Ex. 7: John Dep. 41.)

23.    Denies, except admits that RIT Policy, when read to him at the deposition, said what it did.  (Byler Decl. Ex. 7: John Dep. 41.)

## The Alleged Incident of July 3-4, 2020

24.    Admit.

25.    Admit.

26.    Denies, except admits that all prior times of sexual intercourse, which were four to six times and which occurred between the Fall of 2019 and Spring 2020, were consensual. (Byler Decl. Ex. 7: John Doe Dep. 52; John Decl.  ¶¶ 3, 15.)

27.     Denies, except admits that Jane Roe and her two friends called John to take them to their AirBnB for the Fourth of July weekend and there, convinced John to stay the night with Jane Roe indisputably inviting John to share her bed.  (Byler Decl. Ex. 8: Smith-Schubart Dep.25; Byler Decl. Ex. 9: Boulais Dep. 50.) John viewed the sexual contact that night as consensual consistent with his prior sexual experience with Jane Roe and Jane Roe's actions indicating consent. (Byler Decl. Ex. 7: John Dep. 95-107; John Decl. ¶¶ 9-17; Byler Decl. Ex. 1 tr. 63, 65-66.)

28.     Denies, except admits that July 3-4. 2021, when Jane Roe and her two friends called John to take them to their AirBnB for the Fourth of July weekend and there, convinced John to stay the night with Jane Roe indisputably inviting John to share her bed.  (Byler Decl. Ex. 8: Smith-Schubart Dep.25; Byler Decl. Ex. 9: Boulais Dep. 50.)  Jane Roe and her friends asked John Doe to stay the night over at the AirBnB and he assented in response to the womens' pleas not to drive under intoxication and in response to Jane Roe looking at John Doe like she did before when they had sexual relations before (Byler Decl. Ex. 7: John Dep. 95-107; John Decl. ¶¶ 3, 9-17.)

29.     Denies, except admits that when Jane Roe and John shared Jane Roe's bed by mutual consent, Jane Roe and John kissed, for which John had consent (John did not agree to RIT's argument he did not have consent).  (Byler Decl. Ex. 7: John Dep. 100-107, 130-131; John Decl.  ¶¶ 3, 9-17.)

30.     Denies, except admits that when John fingered Jane Roe's vagina, it was with consent, as Jane Roe was looking at John like she did before when they had

sexual relations before and Jane Roe was "perfectly engaged in it" as she had in prior sexual episodes with had with John before AND Jane Roe was "perfectly engaged in it" as she had in prior sexual episodes with had with John AND Jane Roe had her hands all over John's body AND Jane Roe placed her hand on John's penis AND Jane Roe was kissing John Doe back. (Byler Decl. Ex. 7: John Dep. 52, 100-107, 130; Byler Decl. Ex 1, tr. 63, 65, 66; John Decl ¶¶ 14-17.)   There was not "silence." (Byler Decl. Ex. 7: John Dep. 130-131.)

31.    Denies, except admits that John had consent to engage in sexual acts with Jane Roe as Jane Roe was looking at John like she did before when they had sexual relations before and Jane Roe was "perfectly engaged in it" as she had in prior sexual episodes with had with John AND Jane Roe had her hands all over John's body AND Jane Roe placed her hand on John's penis AND Jane Roe was kissing John Doe back. (Byler Decl. Ex. 7: John Dep. 52, 100-107, 130; Byler Decl. Ex 1, tr. 63, 65, 66; John Decl ¶¶ 14-17.)   There was not "silence." (Byler Decl. Ex. 7: John Dep. 130-131.)

## The Title IX Complaint and the Title IX Investigation

32.    Denies, but admits that Jane Roe's March 15, 2021 RIT complaint was filed approximately nine months after the alleged incident on July 3-4, 2021 and that whether non-consensual sexual contact and/or non-consensual sexual intercourse occurred depended upon the actual facts of what happened nine months earlier. (Byler Decl. Ex. 7: John Dep. 100-107, 130-131; John Decl.  ¶ 22.)

33.    Admits.

34.     Denies, but admits that there is a March 17, 2021 Notice of Investigation that was identified by John in his deposition. John testified what happened when contacting Jane Roe upon receipt of the March 17, 2021 Notice of Investigation before he read the no-contact order portion of the Notice.  (Byler Decl. Ex. 7: John Dep. 36-38.) Smith-Schubart admitted that it was "just the one time" John violated the order and that there were no other violations. (Byler Decl. Ex. 8: Smith-Schubart Dep.37.) Thie first outcome letter in not finding a violation of the no-contact order reflected a sensible practical judgment that there was no refusal to comply with no-contact order, just an inadvertent initial communication. (Byler Decl. Ex. 7: John Dep.32 & Ex. 1; Byler Decl. Ex. 3; John Decl.¶¶ 2, 35.)

35.     Denies, but admits that after the Notice of Investigation, RIT's Public Safety promptly commenced an investigation. (Byler Decl. Ex. 7: John Doe Dep.47-48 & Ex. 4.)

36.     Admits, except adds that notification of formal rights to being presumed not responsible for the alleged conduct, a conclusion being reached at the end of the grievance process and having the standard of review of the preponderance of the evidence states how it ought to have been (but wasn't) – John denies that at the second hearing, he was presumed not guilty, denies a conclusion is reached at the end of the grievance process, and denies there was a preponderance of the evidence for responsibility in his case. (Byler Decl. Ex. 7: John Dep. 40-42; John Decl.¶32; Opposition Memorandum of Law, pp. 18-19.)

37.    Admits, except adds that he came to doubt the effectiveness of his assigned advocate on his behalf. (Byler Decl. Ex. 7: John Dep. 40-42.)

38.    Admits.

39.    Denies, but admits receiving a March 17, 2021 Notice of Investigation that included farther down in the document a no-contact order that on its face was mutual. (Byler Decl. Ex. 7: John Doe Dep. 40-42 & Ex. 1; John Decl. ¶ 27.)

40.    Denies, but admits that John, before he read the no-contact order portion of the March 17, 2021 document, texted Jane Roe to "figure out what's going on," that this was the one and only time John Doe did not adhere to the no-contact order and that the one time was accidental, and that there were no other violations. (Byler Decl. Ex. 7: John Dep. 40-42 & Ex. 3; Byler Decl. Ex. 8: Smith-Schubart Dep.68; John Decl. ¶ 27.)

41.    Admit, except also admits that the investigation Evidence Packet contains the evidentiary materials it does.  (Byler Decl. Ex. 7: John Dep.55, 62-63 & Ex. 9.)

42.    Admit, except also admits that the investigation Evidence Packet contains the evidentiary materials it does.  (Byler Decl. Ex. 7: John Dep.55, 62-63 & Ex 9.)

43.    Admit.

44.    Admit, except clarifies Ex. 9 was the notification of complete investigation and the investigation Evidence Packet that was marked for John's

deposition as Ex. 11 was for the first hearing.  (Byler Decl. Ex. 7: John Dep. 66-67 & Exs 9, 11.)

45.    Admit, except clarifies Ex. 9 with notification of complete investigation and the investigation Evidence Packet that was marked for John's deposition as Ex. 11 was for the first hearing.  (Byler Decl. Ex. 7: John Dep.66-67 & Exs 9, 11.)

<u>**The First Hearing and Outcome**</u>

46.    Admit.

47.    Admit.

48.    Admit.

49.    Admit.

50.    Admit, except admits that the first hearing proceedings were audio recorded and by agreement of counsel were transcribed.  (Byler Decl.¶ 3: Ex. 1.)

51.    Admit.

52.    Denies, except admits that the first panel outcome letter states its findings, which did not find John responsible for non-consensual sexual intercourse and did not find John responsible for violating the March 17, 2021 no-contact order. (Byler Decl. Ex. 3; Byler Decl. Ex. 7: John Dep.32, 55, 62-63; John Decl. ¶¶ 35-37.) The outcome letter was not put in the summary judgment record by RIT, and John in his deposition acknowledged receiving the outcome letter but it was not shown to John during his deposition.  (Byler Decl. Ex. 7: John Dep. 69; John Decl. ¶¶ 35-37.) John has identified the first outcome letter for the summary judgment record.  (Byler Decl. Ex. 3; John Decl.¶¶ 2, 35.)

53.     Denied, the first panel Hearing Officers did not find John responsible for non-consensual sexual intercourse.  (Byler Decl. Ex. 7: John Dep.55, 62-63.)  The outcome letter was not put in the summary judgment record by RIT, and John in his deposition acknowledged receiving the outcome letter but it was not shown to John during his deposition.  (Byler Decl. Ex. 7: John Dep. 69; John Decl. ¶¶ 35-37.)  John has identified the first outcome letter for the summary judgment record.  (Byler Decl. Ex. 3; John Decl.¶¶ 2, 35.)

54.     Admit.

55.     Denies, except admits that the outcome letter was not put in the summary judgment record by RIT, and John in his deposition acknowledged receiving the outcome letter but it was not marked and was not shown to John during his deposition.  (John Decl. ¶¶ 35-37.)  John has identified the first outcome letter for the summary judgment record.  (Byler Decl. Ex. 3; John Decl.¶¶ 2, 35.)

56.     Denies, except admits that the first outcome letter was not put in the summary judgment record by RIT, and John in his deposition acknowledged receiving the outcome letter but it was not shown to John Doe during his deposition.  (Byler Ex. 7: John Dep 69; John Decl.¶¶ 2, 35.) John has identified the first outcome letter for the summary judgment record.  (Byler Decl. Ex. 3; John Decl.¶¶ 2, 35.)

## The First Appeal

57.     Denied, except admits that John Doe's appeal document, dated June 3, 2021, is Exhibit 15 to John's deposition and argues that the sanction was too severe

and that new information was available.  (Byler Decl. Ex. 7: John Dep 69, 77, 93 &

Ex. 15.)

58.     Admit.

59.     Admit, except also admits that Lexi Anderson stated that Jane Roe was

not affected by what had transpired between Jane Roe and John Doe, that she (Lexi

Anderson) had screenshots proving Jane Roe wrong, and that Lexi Anderson provided

the screenshots to John Doe to support his appeal – the screenshots showing a smiling

Jane Roe standing closely next to John the day after the alleged incident.  (Byler Decl.

Ex. 7: John Doe Dep 69, 77, 93; John Decl. ¶ 40.)

60.     Admit.

61.     Denied, Lori Anderson's statement and information were totally

inconsistent with non-consensual sexual contact with Jane Roe. (Byler Decl. Ex. 7:

John Dep. 72, 88-89 &  Exs. 13, 16, Exs. P, Q.)  John testified that the picture of a

smiling Jane Roe with her two friends and John the day after the alleged incident

showed no assault had occurred.  He was hotly challenged on that point in deposition

(albeit with an unscientific notion), but John replied he knew a woman who had been

actually sexually assaulted and she would not have been smiling and hugging the

next day.  (Byler Decl. Ex. 7: John Dep 88-89 & Ex. 16, Ex. P; John Decl. ¶ 38.) Title

IX DeRooy's request to Public Safety to verify with Jane Roe the timing and validity

of the picture (Byler Decl. Ex. 10: DeRooy Dep. 59 & Ex. 3; Byler Decl. Ex. 11; Byler

Decl.7: John Dep. Ex. 16, Ex. P) reflected the common-sense reaction that the picture

was inconsistent with an assault having occurred.

62.    Admit.

## The Second Hearing and Outcome

63.    Denied, except admits that the additional information was added to the investigation Evidence Packet for the second hearing.  (Byler Decl. Ex. 7: John Dep 69, 77, 93 & Ex. 16; John Decl. ¶¶ 38-41.)

64.    Admit, except admits that the second hearing proceedings were audio recorded and by agreement of counsel were transcribed.  (Byler Decl.¶ 3 & Ex. 2.)

65.    Admit.

66.    Denied, the second hearing outcome was inconsistent with Smith-Schubart and St. Jean "considering" all the evidence; in fact, Smith-Schubart and St. Jean did not genuinely consider the additional evidence, but rather arbitrarily rationalized treating it as "outside the scope" irrelevant and essentially to be ignored. While Smith-Schubart asserted that she and St, Jean "considered" the entire Evidence packet for the second panel, when questioned about how the second panel considered the information in Exhibits P and Q, she repeated a mantra of considering all the evidence, followed up by RIT obstruction, followed by asserting the second panel focused on the specific time period of July 3-4, 2021, when John and Jane Roe interacted, followed by an incorrect assertion Lexi Anderson wasn't there (the picture Ex. P showed she was there).  (Byler Decl. Ex. 8: Smith-Schubart Dep.45-47.)  Smith-Schubart at the time did tell John how the second Hearing Officers Smith-Schubart and St. Jean treated the additional evidence as "outside the scope" not relevant and thus not considered.  (Byler Decl. Ex. 7: John Dep 30-31, 114.)

67.    Denied, Smith-Schubart engaged in an artifice in her deposition denying knowledge of the first outcome letter which was part of the RIT disciplinary file in the case. (Byler Decl. Ex. 4: Smith-Schubart Dep. 13-15 & Ex. 1.)  Title IX Coordinator DeRooy knew about the first outcome letter.  (Byler Decl. Ex. 10: DeRooy Dep. 53.) While second appeal panelist Boulais denied that the Appeal Board on the second appeal considered the materials from the previous first hearing, Boulais knew the first outcome of probation, they all knew a second hearing was required and it was known John was arguing the suspension was disproportionate.  (Byler Decl. Ex. 9: Boulais Dep. 19-20, 25-27 & Ex. 2.)  Smith-Schubart's statement of motive for willful blindness as to the first outcome – to be non-biased (RIT Mem. 11) (i) is not a legal basis for summary judgment, as discussed in John's Opposition Memorandum of Law; and (ii) is belied by how, as discussed in John's Opposition Memorandum of Law, the second panel was biased in rationalizing ignoring the additional evidence, conducting a hearing reeking of biased pre-judgment, misapplying the preponderance of the evidence, finding John responsible for violating the no-contact order based on only one inadvertent communication, and making a decision to impose a severe suspension.  The second hearing with Smith-Schubart and St. Jean saw the panelists incessantly talking among themselves about possible Policy violations (Byler Decl. Ex. 2, tr 2-8, 64-65) with questions to Jane Roe and John that reflected bias, not impartiality. Fourteen questions were asked of Jane Roe and in a way to elicit testimony to treat Jane Roe as intoxicated and to establish oral sex; instead, Jane Roe said she did not remember what happened in the bathroom. (Byler Decl. Ex. 2.,

tr 15, 17, 20-22, 26, 28, 30, 36, 58-59.) Thirty questions were asked of John, seeking details about conversation and kissing and seeking John to admit to attempted penile penetration. (Byler Decl. Ex. 2., tr 26-27, 35.) John testified he was invited to stay the night at the AirBnb by Jane Roe and that he had consent for the sexual activity, there was no oral sex and no attempted penile penetration, that there were no indications what sexual activity occurred was not consensual -- no negative response and no pushback by Jane Roe, and Jane Roe stroked John's penis.  (Byler Decl. 2, tr 19-20, 25-26, 40, 49, 54-56.)  But the second panel made incorrect comments that John was assuming consent to the vaginal penetration solely from prior sexual experience (Byler Decl. 2, tr 2-8, 43-46), and the audio of the second hearing records Smith-Schubart laughing at John (John Decl. 43-44) at the following points in the transcript: Byler Decl. 2, tr 39 line 7-8; tr 39 line 19-20; tr 40 line 2-4; tr 40 lines 6-7; tr 40 line 10; tr 44 line 21-23; tr 45 line 13-14; tr 46 line 10 – there, the transcript reflected the laughter joined in by St. Jean when John is called an "ass".  At that point, DeRooy says there's no need to spend time on anything else if she thinks its clear enough. (Byler Decl. 2, tr 47, lines 11-14). DeRooy's comment and the "ass" comment betray the pre-judgment and bias of the second panel.

68.     Denied, except admits that an outcome letter dated September 9, 2021, was issued recording the decision of the second panel Hearing Officers.  (Byler Decl. Ex. 8: Smith-Schubart Dep. 41 & Ex. 4.)

69.     Denied, except admits that an outcome letter dated September 9, 2021, was issued recording the decision of the second panel Hearing Officers.  (Byler Decl. Ex. 4: Smith-Schubart Dep. 41 & Ex. 4 to Smith-Schubart Dep.)

70.     Denied, except admits that an outcome letter dated September 9, 2021, was issued recording the decision of the second panel Hearing Officers.  (Byler Decl. Ex. 4: Smith-Schubart Dep. 41 & Ex. 4 to Smith-Schubart Dep.)

71.     Denied, except admits that an outcome letter dated September 9, 2021, was issued recording the decision of the second panel Hearing Officers.  (Byler Decl. Ex. 8: Smith-Schubart Dep. 41 & Ex. 4.)

72.     Denied, except admits that while suspension was a possible penalty, John received only probation after the first hearing, there was additional exonerating evidence for the second hearing showing no violation, and, as discussed in his Memorandum of Law, John denies that there was a preponderance of the evidence in his case supporting a suspension. The first hearing outcome letter was not put in the summary judgment record by RIT, and John in his deposition acknowledged receiving the outcome letter but it was not shown to John Doe during his deposition.  (Byler Ex. 7: John Dep 69; John Decl.¶¶ 2, 35.) John has identified the first outcome letter for the summary judgment record.  (Byler Decl. Ex. 3; John Decl.¶¶ 2, 35.)

## The Second Appeal and Outcome

73.     Admit.

74.     Admit.

75.     Denies, except admits that as to the second hearing, a second Appeal Board hearing was held on October 5, 2021, at which John made an oral presentation that was cut off. (Byler Ex. 7: John Dep 118; Byler Decl. Ex. 9: Boulais Dep. 39; Byler Decl. Ex. 8: Smith-Schubart Dep. 83.)  The appeal hearing was not recorded.  (Byler Decl. Ex. 10: DeRooy Dep. 64.)

76.     Admit.

77.     Denied, Title IX Coordinator DeRooy knew about the first outcome letter.  (Byler Decl. Ex. 10: DeRooy Dep. 53.) While second appeal panelist Boulais denied that the Appeal Board on the second appeal considered the materials from the previous first hearing, Boulais knew the first outcome of probation, they all knew a second hearing was required and it was known John was arguing the suspension was disproportionate.  (Byler Decl. Ex. 9: Boulais Dep. 19-20, 25-27 & Ex. 2.)  The second hearing with Smith-Schubart and St. Jean saw the panelists incessantly talking among themselves about possible Policy violations (Byler Decl. Ex. 2, tr 2-8, 64-65) with questions to Jane Roe and John that reflected bias, not impartiality. Fourteen questions were asked of Jane Roe and in a way to elicit testimony to treat Jane Roe as intoxicated and to establish oral sex; instead, Jane Roe said she did not remember what happened in the bathroom. (Byler Decl. Ex. 2., tr 15, 17, 20-22, 26, 28, 30, 36, 58-59.) Thirty questions were asked of John, seeking details about conversation and kissing and seeking John to admit to attempted penile penetration. (Byler Decl. Ex. 2., tr 26-27, 35.) John testified he was invited to stay the night at the AirBnb by Jane Roe and that he had consent for the sexual activity, there

was no oral sex and no attempted penile penetration, that there were no indications what sexual activity occurred was not consensual -- no negative response and no pushback by Jane Roe, and Jane Roe stroked John's penis. (Byler Decl. 2, tr 19-20, 25-26, 40, 49, 54-56.) But the second panel made incorrect comments that John was assuming consent to the vaginal penetration solely from prior sexual experience (Byler Decl. 2, tr 2-8, 43-46), and the audio of the second hearing records Smith-Schubart laughing at John (John Decl. 43-44) at the following points in the transcript: Byler Decl. 2, tr 39 line 7-8; tr 39 line 19-20; tr 40 line 2-4; tr 40 lines 6-7; tr 40 line 10; tr 44 line 21-23; tr 45 line 13-14; tr 46 line 10 – there, the transcript reflected the laughter joined in by St. Jean when John is called an "ass". At that point, DeRooy says there's no need to spend time on anything else if she thinks its clear enough. (Byler Decl. 2, tr 47, lines 11-14). DeRooy's comment and the "ass" comment betray the pre-judgment and bias of the second panel. Smith-Schubart's statement of motive for willful blindness as to the first outcome – to be non-biased (RIT Mem. 11) (i) is not a legal basis for summary judgment, as discussed in John's Opposition Memorandum of Law; and (ii) is belied by how, as discussed in John's Opposition Memorandum of Law, the second panel was biased in rationalizing ignoring the additional evidence, conducting a hearing reeking of biased pre-judgment, misapplying the preponderance of the evidence, finding John responsible for violating the no-contact order based on only one inadvertent communication, and making a decision to impose a severe suspension.

78.    Admit.

## RIT Disciplinary Data

79.    Denies, except admits that the data presented was for a six-month period January 1, 2021 to July 1, 2021, not all of 2021. (Byler Decl. Ex. 6: DeRooy Dep. 31: Byler Decl. Exs. 7-8.)

80.    Admit, except denies the data is legally relevant to the pertinent "undue severity" prong of selective enforcement.  The legally relevant figures cited by John provide a meaningful measure of selectivity against John for the *Yusuf* "undue severity" prong in "selective enforcement."   In the last six months of 2021, when John's case was adjudicated to suspension, there were 11 complaints, five found responsible and given probation only, no one went through a formal hearing and suspended, but one went through a mutual resolution, found responsible and suspended (Byler Decl. Ex. 10: DeRooy Dep. 31-32, 51-52 & Ex. 2.)

81.    Admit, except denies the data is legally relevant to the pertinent "undue severity" prong of selective enforcement.   The figures cited by John provide a meaningful measure of selectivity against John in "undue severity" in sanction.   In the last six months of 2021, when John's case was adjudicated to suspension, there were 11 complaints, five found responsible and given probation only, no one went through a formal hearing and suspended, but one went through a mutual resolution, found responsible and suspended (Byler Decl. Ex. 10: DeRooy Dep. 31-32, 51-52 & Ex. 2.)

82.     Admit, except denies the data is legally relevant to the pertinent "undue severity" prong of selective enforcement. The legally relevant figures cited by John provide a meaningful measure of selectivity against John in "undue severity" in sanction.   In the last six months of 2021, when John's case was adjudicated to suspension, there were 11 complaints, five found responsible and given probation only, no one went through a formal hearing and suspended, but one went through a mutual resolution, found responsible and suspended. (Byler Decl. Ex. 10: DeRooy Dep. 31-32, 51-52 & Ex. 2.)

## **Evidence of Gender Bias**

84.     Denied, RIT's argumentation about and mischaracterization of John Doe's deposition testimony when asked about the gender bias at the second hearing does not constitute an undisputed material fact.  John in deposition asked: "how does one go from probation to suspension" (Byler Decl. Ex. 7: John Dep. 26), and John's answer was the suspension was "gender biased against" him and described how a hostile second panel derisively acted toward him from the start, asking targeting questions asking targeting questions and making him uncomfortable (Byler Decl. Ex. 7: John Dep. 22, 23-24, 28-29); the audio of the second hearing reflects the second panel rudely mocking him (John Decl. 43-44, 46); the hearing transcript shows the second panelists rudely mockingly calling John an "ass" (Byler Decl. Ex. 2, tr 46.) The hearing transcript shows the second panelists incessantly talking among themselves about Policy violations, asking 14 questions of Jane Roe to treat her as intoxicated and subject to oral sex and 30 questions were asked of John to incriminate him (Byler

Decl. Ex. 2.).  As discussed in John's Opposition Memorandum of Law, the bias was also revealed in the handling of the issues of the preponderance of the evidence, the No Contact Order, and the decision to impose on John a suspension of undue severity. The RIT second hearing panel, hostile to John, engaged in artificial rationalization in essentially ignoring the additional exonerating evidence and disregard of the first outcome to reach a sex biased result. John Doe's Declaration (¶55) reviews what he actually testified to, which were manifestations of biased pre-judgment contrary to his formal rights of being presumed not responsible for the alleged conduct, having a conclusion reached at the end of the grievance process and having the standard of review of the preponderance of the evidence (but wasn't).

85.     Denied, RIT's argumentation about and mischaracterization of John Doe's deposition testimony when asked about the gender bias at the second hearing does not constitute an undisputed material fact.  John in deposition asked: "how does one go from probation to suspension" (Byler Decl. Ex. 7: John Dep. 26), and John's answer was the suspension was "gender biased against" him and described how a hostile second panel derisively acted toward him from the start, asking targeting questions asking targeting questions and making him uncomfortable (Byler Decl. Ex. 7: John Dep. 22, 23-24, 28-29); the audio of the second hearing reflects the second panel rudely mocking him calling him an "ass" (John Decl. 43-44, 46); the hearing transcript shows the second panelists rudely mockingly calling John an "ass" (Byler Decl. Ex. 2, tr 46.)  The hearing transcript shows the second panelists incessantly talking among themselves about Policy violations asking 14 questions of Jane Roe to

treat her as intoxicated and subject to oral sex and 30 questions were asked of John to incriminate him (Byler Decl. Ex. 2.).    As discussed in John's Opposition Memorandum of Law, the bias was also revealed in the handling of the issues of the preponderance of the evidence, the No Contact Order, and the decision to impose on John a suspension of undue severity.    RIT's glib response that John just disagreed with the outcome and RIT followed its procedures does not remotely establish the basis for summary judgment. How RIT implemented its procedures is the problem. The RIT second hearing panel, hostile to John, engaged in artificial rationalization in essentially ignoring the additional exonerating evidence and disregard of the first outcome to reach a sex biased result. John Doe's Declaration (¶55) reviews what he actually testified to, which were manifestations of biased pre-judgment contrary to his formal rights of being presumed not responsible for the alleged conduct, having a conclusion reached at the end of the grievance process and having the standard of review of the preponderance of the evidence (but wasn't).

86.    Denied, RIT's argumentation about and mischaracterization of John Doe's deposition testimony when asked about the gender bias at the second hearing does not constitute an undisputed material fact.  John in deposition asked: "how does one go from probation to suspension" (Byler Decl. Ex. 7: John Dep. 26), and John's answer was the suspension was "gender biased against" him and described how a hostile second panel derisively acted toward him from the start, asking targeting questions asking targeting questions and making him uncomfortable (Byler Decl. Ex. 7: John Dep. 22, 23-24, 28-29); the audio of the second hearing reflects the second

panel rudely mocking him calling him an "ass" (John Decl. 43-44, 46); the hearing transcript shows the second panelists rudely mockingly calling John an "ass" (Byler Decl. Ex. 2, tr 46.)  The hearing transcript shows the second panelists incessantly talking among themselves about Policy violations asking 14 questions of Jane Roe to treat her as intoxicated and subject to oral sex and 30 questions were asked of John to incriminate him (Byler Decl. Ex. 2.).  As discussed in John's Opposition Memorandum of Law, the bias was also revealed in the handling of the issues of the preponderance of the evidence, the No Contact Order, and the decision to impose on John a suspension of undue severity.  RIT's glib response that John just disagreed with the outcome and RIT followed its procedures does not remotely establish the basis for summary judgment. How RIT implemented its procedures is the problem. The RIT second hearing panel, hostile to John, engaged in artificial rationalization in essentially ignoring the additional exonerating evidence and disregard of the first outcome to reach a sex biased result. John Doe's Declaration (¶55) reviews what he actually testified to, which were manifestations of biased pre-judgment contrary to his formal rights of being presumed not responsible for the alleged conduct, having a conclusion reached at the end of the grievance process and having the standard of review of the preponderance of the evidence (but wasn't).

87.     Denied, RIT's argumentation about and mischaracterization of John Doe's deposition testimony when asked about the gender bias at the second hearing does not constitute an undisputed material fact.  John in deposition asked: "how does one go from probation to suspension" (Byler Decl. Ex. 7: John Dep. 26), and John's

answer was the suspension was "gender biased against" him and described how a hostile second panel derisively acted toward him from the start, asking targeting questions and making him uncomfortable when testifying; the transcript of the second hearing reflects the second panel rudely treating John (Byler Decl. Ex. 7: John Dep. 22, 23-24, 28-29; Byler Decl. Ex. 2, tr. 39-46).  As discussed in John's Opposition Memorandum of Law, the bias was also revealed in the handling of the issues of the preponderance of the evidence, the No Contact Order, and the decision to impose on John a suspension of undue severity.  RIT's glib response that John just disagreed with the outcome and RIT followed its procedures does not remotely establish the basis for summary judgment. How RIT implemented its procedures is the problem. The RIT second hearing panel, hostile to John, engaged in artificial rationalization in essentially ignoring the additional exonerating evidence and disregard of the first outcome to reach a sex biased result. John's Declaration (¶55) reviews what he actually testified to, which were manifestations of biased pre-judgment contrary to his formal rights of being presumed not responsible for the alleged conduct, having a conclusion reached at the end of the grievance process and having the standard of review of the preponderance of the evidence (but wasn't).

**Dated:  August 21, 2023**

**Respectfully submitted,**
**LAW OFFICES OF PHILIP A. BYLER**
By: /s/ *Philip A. Byler*

**Philip A. Byler, Esq.**
**11 Broadview Drive**
**Huntington, New York 11743**
**(631) 848-5175**
philb@optonline.net
***Attorneys for Plaintiff John Doe***

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that, on August 21, 2023, the foregoing Plaintiff Opposition to RIT's Local

Rule 56 Statement of Material Facts was electronically served by e-filing upon:

BOND, SCHOENECK & KING, PLLC
Jennifer M. Schwartzott, Esq.
Stephanie Hoppe Fedorka, Esq.
Attorneys for Defendant Rochester Institute
of Technology
350 Linden Oaks, Third Floor
Rochester, New York 14625
Telephone: (585) 362-4848
Email: JSchwartzott@bsk.com
mcclungk@bsk.com


_____*Philip A. Byler*_____
Philip A. Byler