UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

JOHN DOE,

                               Plaintiff,

                                                      Case # 21-CV-6761-FPG

v.

                                                      DECISION AND ORDER

ROCHESTER INSTITUTE OF TECHNOLOGY,

                               Defendant.

## INTRODUCTION

Plaintiff John Doe[1] brings this action against Defendant Rochester Institute of Technology ("RIT"), alleging that he was wrongly disciplined due to gender bias, in violation of Title IX of the Education Amendments of 1972 and in breach of his rights under RIT's student policies. ECF No. 1. RIT moves for summary judgment. ECF No. 25. Plaintiff opposes the motion, ECF No. 30, and RIT has filed its reply. ECF No. 36. Both parties filed supplemental memoranda. ECF Nos. 42, 43. For the reasons that follow, RIT's motion for summary judgment is GRANTED IN PART and DENIED IN PART.

## LEGAL STANDARD

Summary judgment is appropriate when the record shows that there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P.

---

[1] In May 2022, Magistrate Judge Payson granted Plaintiff's motion to proceed by pseudonym. ECF No. 14. Judge Payson also ordered that the complainant in the disciplinary proceedings—known as "Jane Roe" in the complaint— be referred to by pseudonym. For purposes of summary judgment, the Court will continue to permit pseudonymity. However, a "different balance of interests comes into play at the trial phase." *Lawson v. Rubin*, No. 17-CV-6404, 2019 WL 5291205, at *2 (E.D.N.Y. Oct. 18, 2019) (internal ellipsis omitted). The Court advises the parties that it does not intend to permit pseudonymity (or any related sealing or protective order) at trial, absent a formal motion demonstrating that such relief is justified under the circumstances.

56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Disputes concerning material facts are genuine where the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In deciding whether genuine issues of material fact exist, the court construes all facts in a light most favorable to the non-moving party and draws all reasonable inferences in the non-moving party's favor. *See Jeffreys v. City of New York*, 426 F.3d 549, 553 (2d Cir. 2005). However, the non-moving party "may not rely on conclusory allegations or unsubstantiated speculation." *F.D.I.C. v. Great Am. Ins. Co.*, 607 F.3d 288, 292 (2d Cir. 2010) (quotation omitted).

## BACKGROUND

The following facts are taken from the record, as viewed in the light most favorable to Plaintiff. RIT is a private university located in Rochester. Plaintiff enrolled as an undergraduate student at RIT in Fall 2018. In Fall 2019, Plaintiff met Jane Roe,[2] another RIT student, via the online dating application "Tinder." From Fall 2019 to Spring 2020, Plaintiff and Roe engaged in consensual sexual activities, including sexual intercourse, approximately "four to six times." ECF No. 25-1 ¶ 26; ECF No. 31 ¶ 26. On the evening of July 3, 2020, Plaintiff met Roe and her friends at a bar, and accompanied them to a residence that Roe and her friends had rented for the weekend. The sexual conduct between Plaintiff and Roe on that date—the nature of which is disputed— became the subject of Plaintiff's later disciplinary proceedings.

More than eight months later, on March 15, 2021, Roe filed an internal complaint with RIT's Title IX office, ECF No. 37-8 at 5 and Plaintiff received a "Notice of Investigation and Allegations" summarizing her complaint two days later. ECF No. 25-7 at 1. The summary of Roe's complaint reads:

---

[2] *See* note 1, *supra*.

[Roe] reported that on July 3rd, 2020, you made sexual contact with her without her consent at an Air B&B that she rented for the July 4th weekend. She shared that she allowed you to share the bed she was sleeping in as there was nowhere else to sleep and she was concerned about you driving while intoxicated. [Roe] shared that you and she were just friends at that time and hadn't had a sexual relationship since the previous year. She said you had a girlfriend and she respected that. She reported that as soon as the lights went out, you began hugging and kissing her. She told you "no" but you continued. [Roe] alleges that you then forcibly pushed your hand down into her pants and penetrated her vagina with your fingers. She said that she told you to stop and you did for a short period. She then reports that you then placed her hand on your penis, climbed on top of her, and tried to push her underwear to the side to penetrate her vagina. She reports that you were not successful. [Roe] said that you then went to the bathroom and motioned for her to follow you. She said she followed you into the bathroom "not knowing what to expect." At that time you asked her to perform oral sex on you and she began to. [Roe] said that you firmly held her head in place with both hands which made it very difficult to stop the oral sex. She eventually pushed away. You then asked her to lay down on the bathroom floor, to which she said "no." She reports that you then lifted her onto the top of the counter in an attempt to penetrate her with your penis, but she left the bathroom to prevent that from happening. She returned to the bedroom and reported no additional sexual activity happened after you also returned to the bedroom. [Roe] alleges that you then told her not to tell anyone what happened.

ECF No. 37 at 1.

The complaint notified Plaintiff that, "[b]ased on these allegations," RIT believed that Plaintiff may have violated RIT's "Non Consensual Sexual Contact" (III.G.1) and "Non Consensual Intercourse" (III.G.2) student policies. *Id.* The former generally encompasses "any intentional sexual touching [of another], however slight," and the latter generally encompasses sexual penetration. ECF No. 25-13 at 4. To constitute a violation, the conduct must be performed "without Affirmative Consent," *id.*, which means "the ability to engage in activity knowingly and voluntarily." *Id.* at 7. Under RIT policy, "[c]onsent can be given by words (verbal or signed) or actions, as long as those words or actions create clear permission regarding willingness to engage in sexual activity. Silence or lack of resistance, in and of itself, does not demonstrate Consent." *Id.* Pursuant to RIT policy, Plaintiff would be presumed "not responsible" for these alleged violations "unless and until a finding of responsibility was made," ECF No. 25-13 at 25, and any

finding of responsibility could only be reached if the hearing officers concluded that the "misconduct more likely than not occurred." *Id.* at 26.

On the second page of the notice that Plaintiff received is a section titled "Mutual No Contact Order" in bold. ECF No. 37 at 2. It informed Plaintiff that he was not have contact with Roe. *Id.* On the day that Plaintiff received the notice, he sent a text message to Roe reading "Hey." ECF No. 25-7 at 25.

Pursuant to RIT's internal procedures, RIT's Public Safety Department commenced an investigation and met with Plaintiff on March 24, 2021. ECF No. 37-4 at 1. Plaintiff described his version of the events that occurred on July 3, 2020. In brief, Plaintiff stated that the sexual encounter between the pair was consensual. *See id.* Their relationship had not been of a sexual nature recently, since Plaintiff had declined to begin a "romantic relationship" with Roe and had begun dating someone else. *Id.* On July 3, 2020, Plaintiff met Roe and her friends at a bar and drove them to their rental. *Id.* After drinking together, Plaintiff and Roe decided to share a bed to sleep in that night. While in bed together, they kissed and touched each other's genitals. *Id.* Plaintiff suggested that they go into the bathroom to avoid waking up Roe's friends, and Roe agreed. While in the bathroom, the pair continued to kiss, until Roe stopped, pushed Plaintiff away, and told him that she "can't do this anymore because you have a girlfriend." *Id.* The encounter ended, and the pair went back to the bed and slept. *Id.* After that night, Roe told Plaintiff that she felt bad about what happened and encouraged Plaintiff to tell his girlfriend. *Id.* As for the apparent violation of the no-contact order, Plaintiff stated that "he had not yet received the No Contact Order" and "did not know that he was in violation of the No Contact Order." *Id.* at 2.

The investigation continued and resulted in an "Evidence Packet" to be used in the Title IX proceeding. ECF No. 37-8. The first hearing on Roe's complaint occurred on May 24, 2021.

Plaintiff was provided with a student advocate to assist him during the hearing.  ECF No. 25-1 ¶¶ 47, 48.  The hearing was conducted before two hearing officers, Jennifer Newell and Sean Watson.  ECF No. 40-1 at 1.  Stacy DeRooy, Director of RIT's Title IX Office, was also in attendance.  *Id.*  A transcript of that hearing is available in the record (ECF No. 33-1).[3]

A decision was issued on May 28, 2021.  ECF No. ECF No. 33-3 at 3.  The hearing officers found Plaintiff "responsible" for violation of the Non-Consensual Sexual Contact policy, but found him "not responsible" for violation of the Non-Consensual Sexual Intercourse policy.  No. 33-3 at 4.  As to the former, the hearing officers concluded by a preponderance of the evidence that Plaintiff had placed his hands down Roe's pants and inserted his fingers into her vagina without consent.  As to the latter, the hearing officers concluded that, whatever sexual conduct occurred in the bathroom, Plaintiff "discontinu[ed]" it once Roe "rescinded" her consent.  *Id.*  The hearing officers ordered that Plaintiff be placed on a term of probation lasting through July 2021.  *Id.* at 5.

Plaintiff appealed this adverse outcome because, *inter alia*, there was new information that could substantially impact the original outcome.  ECF No. 33-4 at 1.  The additional evidence included an email that another student had written to Newell and DeRooy *prior* to the first hearing but that was "excluded from the hearing process."  ECF No. 37-15 at 3.

In the email, the student states that she was present with Plaintiff and Roe on the night of July 3, 2020.  *Id.* at 6.  The student discloses a variety of information bearing on Roe's credibility

---

[3] RIT objects to Plaintiff's reliance on the transcripts of audio recordings from the first and second hearings, suggesting that they are inadmissible and contain transcription errors.  *See* ECF No. 36 at 9-11.  The Court intends to consider these transcripts at summary judgment, taking into account the alleged errors that RIT identifies.  *See* ECF No. 36-3 at 4-5.  It is well-established that "material relied on at summary judgment need not be admissible in the form presented to the district court," so long as it "will be presented in admissible form at trial."  *Smith v. City of New York*, 697 F. App'x 88, 89 (2d Cir. 2017) (summary order) (internal quotation marks omitted).  Here, RIT does not dispute Plaintiff's claim that RIT itself "made [the] audio recordings of the hearings" and "produced [those recordings] in discovery."  ECF No. 33 ¶ 3; *see also*  ECF No. 25-13 at 25-26 (RIT policy mandating the creation and preservation of a "full and fair record" of each disciplinary hearing).  Given these facts, the RIT has not convinced the Court that the content of the two hearings cannot be "reduced to admissible form at trial"—whether by means of updated transcripts or the audio recordings themselves.  *Smith*, 697 F. App'x at 89.

and motive for her Title IX complaint.  For example, the student observes that, after July 3, 2020, Roe continued to invite Plaintiff to outings and "spent weeks practically blackmailing him so he would tell his girlfriend about the incident."  *Id.*  Importantly, Roe told this student that she "enjoyed [the night of July 3, 2020] but felt guilty [] since she knew he was in a relationship."  *Id.*  The student believed Roe's complaint was a result of "her obsession with [Plaintiff]" and "her jealousy," rather than an honest complaint of sexual assault.  *Id.*  In addition to this email, Plaintiff proffered text messages tending to corroborate the student's narrative.  One text-message chain shows that Roe had subtly threatened Plaintiff that she would tell his girlfriend about the incident.  *See* ECF No. 37-15 at 17 ("[Y]ou don't have to be the one to tell her, there are probably plenty of people who could do that for you.  I know I could name a few.").  Other text messages reveal that Roe had schemed and joked with her friends about disclosing the incident to Plaintiff's girlfriend.  *See id.* at 15, 19; *see also id.* at 21 (after sending copies of Plaintiff's messages, texting to friend: "[PLAINTIFF] BLOCKED ME AHAHAHA").

RIT accepted the appeal on the basis of the evidence and ordered that a new hearing be conducted.  ECF No. 25-1 ¶ 62.  In addition, RIT added a new charge: violation of the no-contact order.

On September 3, 2021, a second hearing was conducted before two new hearing officers, Ericka Smith-Schubart and Bill St. Jean.  ECF No. 33-2.  DeRooy attended this hearing, putatively as a mere "observ[er]."  *Id.* at 2.  Tony Yazback, the Assistant Director of Public Safety, attended, ostensibly to "answer any questions regarding the public safety investigation."  *Id.* at 3.   A transcript of that hearing is available in the record (ECF No. 33-2).

A few aspects of the second hearing merit discussion.  Part way through the hearing, the hearing officers took a break.  ECF No. 33-2 at 38.  They told the parties that they intended to

"confer" with each other to assess whether they had any "additional questions." *Id.* During this break, Smith-Schubart and St. Jean proceeded to talk about their early reactions to the hearing, not only with each other, but with DeRooy and Yazback.[4] Smith-Schubart remarked that, in her view, Plaintiff had made a "blanket statement" that he had "consent" because of "[their] sexual history." *Id.* at 39. She was unsure whether Plaintiff had "been able to demonstrate any affirmative consent." *Id.* In response, Yazback provided guidance to Smith-Schubart on how to interpret Plaintiff's testimony, remarking as an aside that it was "clear as mud." *Id.* at 40. Despite the fact that neither Smith-Schubart nor St. Jean were given access to the prior hearing transcript, DeRooy disclosed that Plaintiff's present testimony regarding the encounter in the bathroom was "not necessarily what was said before." *Id.* at 41. Yazback and DeRooy both opined that it was suspicious that Plaintiff was claiming not to remember what happened in the bathroom given his prior clarity about the night of July 3, 2020. *Id.* at 42.

Smith-Schubart stated that she intended to "flip" the issue and question Plaintiff regarding how he had obtained Roe's consent, since RIT policy "is about affirmative consent." ECF No. 33-2 at 42. Smith-Schubart stated that she believed Plaintiff was relying on "tropes" about consent to justify his behavior, and she was "super floored by that statement." *Id.* at 44. DeRooy acknowledged that "we can't make assumptions about this" and noted that Plaintiff may simply "have a hard time articulating" what he meant. *Id.* at 45. But, DeRooy said, "he did say I assume. I mean we can't makeup words; right? He said I assumed." *Id.* Yazback remarked that "if you assume, you make an ass out of you and me." *Id.* at 46. The transcript records laughter at this remark. *Id.* DeRooy noted that she "appreciate[d] that [Smith-Schubart was] seeing it as clearly

---

[4] It is unclear whether DeRooy and Yazback were permitted to take part in the hearing in the manner that they did. Neither of them was a hearing officer vested with the authority to adjudicate Plaintiff's charges. *See* ECF No. 37 at 14; *see also* ECF No. 33-8 at 42.

as [she was] seeing it." *Id.* at 47.  Before restarting the hearing, DeRooy assured Smith-Schubart that she was "seeing it clearly" and that she should "resist the urge" to worry about the scheduled length of the hearing if "it [is] clear." *Id.*

The hearing proceeded.  When Plaintiff attempted to raise the issue of Roe's later conduct and possible ulterior motive for her complaint, Smith-Schubart rejected its relevance.  She opined that the "focus" should be on "the interactions between the two of you" on July 3, 2020, and felt that later interactions were not "connected." ECF No. 33-2 at 64; *id.* at 73.  Although Plaintiff and his advocate tried to make clear that this conduct was relevant to assessing Roe's credibility, *see id.* at 66, 72, 74-77, Smith-Schubart maintained that it was irrelevant except as "context." *Id.* at 79-80.  At another point, when Plaintiff attempted to discuss Roe's testimony from the first hearing, Smith-Schubart stopped him.  Smith-Schubart claimed to Plaintiff that this was a "brand-new hearing" and that the hearing officers were operating "from the set of facts that are presented to us in this conversation." *Id.* at 77.  Smith-Schubart also cautioned Plaintiff that he should not raise issues "to cloud any of the conversations that we're having about what somebody said last time"—though she did not disclose that DeRooy had already disclosed information about Plaintiff's testimony from the first hearing.  *Id.* at 78.

On September 9, 2021, a decision was issued.  ECF No. 40-5 at 1.  The decision reduced the hotly contested factual disputes to a single question: could Plaintiff defend himself against Roe's allegations by claiming that he "had consent due to [their] prior sexual history"? *Id.* at 2.  Answering that question in the negative, the hearing officers concluded that Plaintiff had committed the sexual misconduct complained of.  *See id.*  Smith-Schubart and St. Jean found Plaintiff responsible on all three alleged violations and ordered that he be suspended for one year. *Id.* at 2-3.  In the section titled "Information Considered," the decision heavily emphasized the

notion—raised by Smith-Schubart and encouraged by DeRooy and Yazback—that Plaintiff believed he had Roe's consent *solely* due to "[his] prior sexual interactions" with Roe.  *Id.* at 2. The decision entirely omits mention of the additional evidence provided during Plaintiff's first appeal.  *See id.*  The omission of this evidence is notable, both because RIT policy requires that hearing officers engage in a "careful review of *all* information presented," ECF No. 25-13 at 26 (emphasis added), and because this evidence is what precipitated the new hearing in the first place. At her deposition, Smith-Schubart admitted that she believed this additional evidence was irrelevant.  *See* ECF No. 40-8 at 48 (stating that evidence post-dating July 3, 2020 "did not help us determine whether or not there was consent for the sexual actions").

Plaintiff appealed the decision from the second hearing panel.  ECF No. 25-1 ¶ 73.  On October 12, 2021 the University Appeals Board upheld the second hearing panel's decision.  ECF No. 33-6 at 1-2.  Like the second hearing panel, the Appeals Board found the sanction appropriate because Plaintiff had "assumed" consent based on their "sexual history."  *Id.* at 2.  The Appeals Board concluded a finding of responsibility was appropriate because "the standard for affirmative consent was not met" based on Plaintiff's "own statements."  *Id.*

As a result, Plaintiff was suspended for the remainder of the 2021-2022 school year.  ECF No. 27 at 15.  In December 2021, Plaintiff brought the present action.  ECF No. 1.  He raises three claims: (1) breach of contract; (2) promissory estoppel; and (3) violation of Title IX.  ECF No. 1 at 50-60.

## DISCUSSION

RIT moves for summary judgment on all three claims.  ECF No. 25.  Plaintiff opposes the motion.  The Court evaluates each claim in turn.

I.     **Breach of Contract**

RIT argues that Plaintiff cannot sustain a claim for breach of contract because the alleged promises on which he relies are insufficiently specific and discrete.  ECF No. 25-14 at 17-18.  In the alternative, RIT argues that there is no evidence that it violated any of its Title IX policies.  *Id.* at 19-20.

Generally, "[t]o make out a breach of contract claim under New York law, a plaintiff must plead (1) the existence of an agreement, (2) adequate performance of the contract by the plaintiff, (3) breach of contract by the defendant, and (4) damages."  *Doe v. Yeshiva Univ.*, No. 22-CV-5405, 2023 WL 8236316, at *11 (S.D.N.Y. Nov. 28, 2023) (internal quotation marks omitted).  "Under New York law, a student and the college or university in which the student enrolls enter into an implied contract, the essence of which is that the academic institution must act in good faith in its dealings with the student."  *Goldberg v. Pace Univ.*, 88 F.4th 204, 210 (2d Cir. 2023).  The precise terms of the implied contract are established by "the university's bulletins, circulars and regulations made available to the student."  *Papelino v. Albany Coll. of Pharmacy of Union Univ.*, 633 F.3d 81, 93 (2d Cir. 2011).  "To [prove] a valid claim for breach of contract in [this] unique context, the student must first identify an express promise for certain specified services in the university's relevant materials."  *Goldberg*, 88 F.4th at 210 (internal quotation marks omitted).  "He then must [establish] when and how the defendant breached [that] specific contractual promise."  *Id.*  "[W]ithout the identification of a specific breached promise or obligation, the claims of a disgruntled student do not suffice" to state a claim for breach of contract.  *Id.* (internal quotation marks omitted).

In the context of a "disciplinary dispute" between a student and the institution, "judicial review of the institution's actions is limited to whether the institution acted arbitrarily or whether

it substantially complied with its own rules and regulations." *Rolph v. Hobart & William Smith Colls.*, 271 F. Supp. 3d 386, 405 (W.D.N.Y. 2017). The student must identify "specific terms of the implied contract that were allegedly violated," such as "an internal rule regulation, or code." *Id.* "General statements of policy or broad pronouncements of a University's compliance with existing anti-discrimination laws [or] promising equitable treatment of all students cannot provide the basis for a breach of contract claim." *Id.* (internal quotation marks and brackets omitted).

The Court agrees with RIT that Plaintiff has largely failed to identify express promises that could form the basis for a breach-of-contract claim. In his complaint, Plaintiff alleges that RIT's "Gender-Based and Sexual Misconduct Policy makes clear that it is intended to be interpreted and applied consistently with Title IX." ECF No. 1 ¶ 150. Plaintiff thus asserts that this university policy "intends that students have impartial investigators investigate the case, impartial hearing officers hear the case, and a fair and impartial disciplinary process," *id.* ¶ 151, and he alleges that RIT violated these intentions. *Id.* ¶¶ 151-52. RIT's declared commitment to Title IX cannot form the basis for a breach-of-contract claim. *See, e.g.*, *Rolph*, 271 F. Supp. 3d at 406-07 (breach-of-contract claim failed where plaintiff cited mere "aspirational statements" that the colleges fashioned disciplinary policies "intended to reflect . . . federal and state laws"); *Doe v. Siena Coll.*, No. 22-CV-1115, 2023 WL 197461, at *17 (N.D.N.Y. Jan. 17, 2023) ("[A] commitment to provide a fair and impartial process is too generic to be an enforceable promise which can form the basis of a breach of contract claim." (internal quotation marks omitted)); *Doe v. Syracuse Univ.*, 341 F. Supp. 3d 125, 141 (N.D.N.Y. 2018) ("Provisions that students will be treated in a 'fundamentally fair' manner, or in a manner that is consistent with fundamental 'student rights,' are the sorts of non-actionable statements of general policy that courts applying New York law have held cannot support a breach of contract claim.").

By contrast, Plaintiff's claim that RIT breached its obligation to apply a preponderance-of-the-evidence standard is the sort of express and specific promise that can sustain a breach-of-contract claim. *See Doe v. Syracuse Univ.*, No. 18-CV-377, 2019 WL 2021026, at *11 (N.D.N.Y. May 8, 2019) (contrasting "general statements of policy" with the "expressly enumerated" guarantee "of the preponderance of evidence standard during a Conduct Board hearing"); *Siena Coll.*, 2023 WL 197461, at *18 (collecting cases).  RIT policy required that a respondent be presumed "not responsible unless and until a finding of responsibility is made," ECF No. 25-13 at 25, and that a finding of responsibility only be made if the hearing officers conclude that "such misconduct more likely than not occurred[] based upon . . . all [the] information presented."  *Id.* at 26.  As a result, Plaintiff could only be found responsible if it were proven by a preponderance of the evidence that he engaged in sexual contact or intercourse "*without* [Roe's] Affirmative Consent."  *Id.* at 4 (emphasis added).

Viewing the evidence in the light most favorable to Plaintiff, a reasonable jury could conclude that RIT violated this promise to apply a preponderance-of-the-evidence standard during Plaintiff's second hearing and appeal.  A reasonable factfinder could infer that the panels instead "flip[ped]" the burden of proof—to use Smith-Schubart's phrasing—onto Plaintiff and required that he prove affirmative consent.  ECF No. 33-2 at 42.  This inference may be gleaned, first and foremost, from the decisions themselves.  The second hearing panel's explicit rationale for finding that Plaintiff had committed sexual misconduct was based on its claim that Plaintiff only alleged he had "consent due to [their] prior sexual history."  ECF No. 33-5 at 2.  Because "[p]rior sexual history is not affirmative consent" under RIT policy, the panel "determined that [Plaintiff] violated RIT policy."  *Id.*; *see also* ECF No. 33-2 at 39 (Smith-Schubart commenting that she was not sure that Plaintiff had "been able to demonstrate any affirmative consent").  No mention was made of

the credibility of Roe's account—a peculiar omission given that Roe's statements about the evening of July 3, 2020 were the primary evidence in the record supporting the claim of non-consensual sexual contact and/or intercourse.

The appeals panel's decision is even more explicit.  It acknowledged but declined to assess the difficult "challenges to [the] credibility" of Roe's statements.  ECF No. 33-6 at 2.  The appeals panel instead held that, based on Plaintiff's "own statements," *he* had not met the "standard for affirmative consent," and "therefore a finding of responsibility is appropriate in this case."  ECF No. 33-6 at 2.  Nicole Boulais—a member of the second appeals panel—admitted that the basis for the panel's decision was that Plaintiff's statements "did not add up to affirmative consent." ECF No. 33-9 at 63.

Again, it must be emphasized that it was not affirmative consent that had to be proven, but the lack thereof.  *See* ECF No. 25-1 at 4, 26.  Even if the panels could rightly find that Plaintiff's account lacked credibility, they still had the affirmative obligation under RIT policy to determine whether it was "more likely than not," based on all the information presented, that Plaintiff engaged in sexual contact or intercourse "*without* [Roe's] Affirmative Consent," *id.* at 4, 9 (emphasis added), which necessarily required inquiry into Roe's credibility and her claims.  Yet the panels' decisions read as if the credibility of Roe's account is either irrelevant or accepted by default—both of which violate RIT's express promises regarding the appropriate standard of proof.[5]

The hearing officers' conduct at the second hearing bolsters this inference.  Remarkably, despite the fact that the second hearing had been held for the express purpose of considering

---

[5] A jury could reasonably find that Boulais admitted as much during her deposition.  Asked whether the second appeals panel considered the exculpatory text messages and photographs that Plaintiff submitted in connection with his first appeal, Boulais stated that the panel did not "spend specific time in talking about those particular documents" but instead focused on Plaintiff's statements.  ECF No. 33-9 at 44-45; *see also id.* at 63-64.

additional evidence bearing on Roe's credibility, *see* ECF No. 37-15 at 3, Smith-Schubart and St. Jean refused to consider Roe's statements and actions after July 3, 2020.  *See* ECF No. 33-2 at 78-79.  This evidence—which included evidence that Roe "enjoyed" the sexual encounter with Plaintiff but sought to absolve her guilt by "blackmailing him," ECF No. 37-15 at 6—bore directly on her motives for, and the credibility of, her claim of sexual assault.  ECF No. 33-2 at 78-79; *see also Doe v. Princeton Univ.*, 30 F.4th 335, 347 (3d Cir. 2022) (evidence that hearing panel disregarded exculpatory evidence supported allegation that panel failed to apply preponderance-of-the-evidence standard); *Doe v. Syracuse Univ.*, 440 F. Supp. 3d 158, 179 (N.D.N.Y. 2020) (plaintiff plausibly alleged a failure to apply applicable standard of proof where conduct board found complainant credible without resolving discrepancies in her statements).

Finally, a reasonable factfinder could infer that the appropriate burden of proof was not impartially applied in light of other comments by RIT officials during the second hearing.  These comments could be interpreted to disclose RIT officials' bias, unprofessionalism, and "result-driven" predisposition.  *Syracuse Univ.*, 440 F. Supp. 3d at 179.  These include: (1) Smith-Schubart's accusation that Plaintiff was relying on "tropes," ECF No. 33-2 at 44; (2) DeRooy's encouragement to Smith-Schubart to embrace that preconception and to "resist the urge" to spend more time questioning Plaintiff, *id.* at 47; (3) the hearing officers' consideration of Plaintiff's testimony at the first hearing (as relayed by DeRooy and Yazback) while also refusing to consider Roe's testimony at the first hearing (as relayed by Plaintiff), *id.* at 41-43, 77-78; and (4) Yazback's joke that Plaintiff was "mak[ing] an ass out" of himself for his assumptions, which elicited laughter from the other RIT officials, ECF No. 33-2 at 46.

Indeed, both panels' overall framing of the relevant dispute—that Plaintiff's defense was solely based on his "assumption" of consent due to their prior sexual history, *see* ECF No. 33-6 at

2; ECF No. 40-5 at 2—could be found to be a highly slanted caricature of his position. To be sure, at one point, Plaintiff did testify that, in light of their sexual history and the fact that "she didn't do anything to say no," he "just assumed it was consensual." ECF No. 33-2 at 28. Nevertheless, looking at his testimony as a whole, Plaintiff made clear that his belief in Roe's consent was grounded in her conduct, a circumstance that RIT policy recognizes. *See* ECF No. 25-13 at 7 (stating that affirmative consent may be manifested through "actions, as long as those . . . actions create clear permission regarding willingness to engage in sexual activity").

Plaintiff testified that over the course of the evening, Roe had been giving him signals that she was interested in engaging in sexual activity—she had invited Plaintiff to drink with her and her friends and later suggested that he stay the night and sleep in her bed. ECF No. 33-2 at 54. Roe had previously texted Plaintiff that they could "cuddle" if they slept together that night. ECF No. 37-11 at 49. Throughout the evening, Roe gave Plaintiff "the same signs" that she had in the past before their sexual encounters. ECF No. 33-2 at 55 (noting that Roe "[gave him] the same looks and all that"). When Plaintiff kissed Roe while they were in bed together, Roe kissed him back. As they kissed, Plaintiff "rubbed" Roe's leg, started moving his hands towards her "vagina," and then "penetrated the vagina." *Id.* at 49. During this time, Roe did not "push back," *id.* at 27, and "started stroking [his] penis." *Id.* at 49. When Plaintiff suggested that they move to the bathroom to continue, Roe "said yeah." *Id.* at 32. After a few minutes in the bathroom, Roe pushed Plaintiff away because he had a girlfriend, and Plaintiff stopped. *Id.*

A reasonable jury could conclude that, despite receiving clarification regarding Plaintiff's version of events, both panels fixated on Plaintiff's passing invocation of the word "assumption" and relied on a caricature of his narrative to find him responsible. *See* ECF Nos. 33-2, 33-6. This framing not only made Plaintiff's position fairly easy to reject out of hand, but also obviated the

need for RIT officials to meaningfully evaluate Roe's credibility or the evidence that called her claims into doubt.  Such facts further support the inference that the panels failed to properly apply the relevant burden of proof. *See Princeton Univ.*, 30 F.4th at 347 (panel's failure to apply burden of proof could be inferred from its failure to "consider[] the entirety of the evidence with a neutral gaze").

For all of these reasons, the Court concludes that Plaintiff has presented sufficient evidence to support his breach-of-contract claim.  Summary judgment is not warranted.

## II.    Promissory Estoppel

RIT contends, *inter alia*, that Plaintiff's promissory estoppel claim is duplicative.  ECF No. 25-14 at 20-21.  The Court agrees.

Where, as here, a plaintiff "alleges breach of a contract, a promissory estoppel claim is duplicative of a breach of contract claim unless the plaintiff alleges that the defendant had a duty independent from any arising out of the contract."  *Annabi v. N.Y.U.*, No. 22-CV-3795, 2023 WL 6393422, at *12 (S.D.N.Y. Sept. 29, 2023).  Plaintiff acknowledges that his promissory-estoppel claim is "an alternative claim" brought "in the event that the contract is deemed unenforceable." ECF No. 30 at 30.  Because there is a specific promise that Plaintiff can seek to enforce via his breach-of-contract claim, the promissory estoppel claim is duplicative, and summary judgment is warranted.

## III.   Title IX

RIT moves for summary judgment on Plaintiff's Title IX theories, asserting that Plaintiff has presented insufficient evidence to show that RIT failed to comply with its policies, that the outcome was erroneous, or that gender bias played a role in the disciplinary proceedings.  ECF

No. 25-14 at 11-16.  The Court disagrees with RIT's first two points but is compelled by binding Second Circuit case law to agree with its third argument.

Title IX provides that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance."  *Doe v. Columbia Univ.*, 831 F.3d 46, 53 (2d Cir. 2016) (internal quotation marks and emphases omitted).  "Because Title IX prohibits . . . subjecting a person to discrimination on account of sex, it is understood to bar the imposition of university discipline where gender is a motivating factor in the decision to discipline."  *Id.* (internal quotation marks and brackets omitted).  "Plaintiffs attacking a university disciplinary proceeding on grounds of gender bias can be expected to fall generally within two categories."  *Yusuf v. Vassar Coll.*, 35 F.3d 709, 715 (2d Cir. 1994).  "In the first category, the claim is that the plaintiff was innocent and wrongly found to have committed an offense."  *Id.*  "In the second category, the plaintiff alleges selective enforcement. Such a claim asserts that, regardless of the student's guilt or innocence, the severity of the penalty and/or the decision to initiate the proceeding was affected by the student's gender."  *Id.*  Plaintiff raises both erroneous-outcome and undue-severity claims.

### a.  Erroneous Outcome

In the context of a Title IX erroneous-outcome claim, a plaintiff must demonstrate "(1) articulable doubt as to the accuracy of the outcome of the disciplinary proceeding, and (2) that gender bias was a motivating factor behind the erroneous finding."  *Doe v. Colgate Univ.*, 760 F. App'x 22, 30 (2d Cir. 2019) (summary order) (internal quotation marks and brackets omitted).  RIT challenges the sufficiency of the evidence as to both elements.  Having reviewed the record, and considering the evidence in the light most favorable to Plaintiff, the Court concludes that there

is sufficient evidence for a reasonable trier of fact to find in Plaintiff's favor on the first element, but there is insufficient evidence to find in Plaintiff's favor on the second element. Therefore, summary judgment must be granted on this claim.

### i. Articulable Doubt as to Accuracy of Outcome

First, there is sufficient evidence to support Plaintiff's claim that the outcome of the second disciplinary proceeding was inaccurate. RIT *itself* had found, after the first hearing, Plaintiff not responsible for Roe's claim of non-consensual sexual intercourse. *See* ECF No. 33-3 at 4. In his declaration, Plaintiff states that the sexual conduct that occurred in July 2020 was consensual. *See* ECF No. 32 ¶¶ 3, 9-17. Although the Second Circuit has assumed that a student's "insistence that the sexual encounter[] [was] consensual" is, by itself, "sufficient to raise a disputed issue of material fact on the question of misconduct," *Colgate*, 760 F. App'x at 30, there are additional facts in the record to support that conclusion beyond Plaintiff's assertion alone.

Plaintiff's theory is that Roe concocted the allegation of sexual assault to punish Plaintiff and assuage her own guilt as a participant in Plaintiff's cheating. There is evidence that, after July 3, 2020, Roe disclosed to a friend that she "enjoyed" the night with Plaintiff "but felt guilty" because Plaintiff "was in a relationship." ECF No. 37-15 at 9. One of Roe's friends observed that, after that night, Roe began "harassing" Plaintiff to tell his girlfriend to such a degree that Roe was "practically blackmailing him." *Id.* A reasonable factfinder could interpret Roe's text messages in that manner. *See id.* at 17 (text message from Roe to Plaintiff) ("[Y]ou don't have to be the one to tell her, there are probably plenty of people who could do that for you. I know I could name a few."); *id.* at 19 (text message from Roe to friend) ("I can't let [Plaintiff's girlfriend] think that he's a good person in any way."); *id.* at 21 (text message from Roe to friend) (after notifying Plaintiff's girlfriend, writing, "[PLAINTIFF] BLOCKED ME AHAHAHA"). When Roe told

Plaintiff's girlfriend about the night, she wrote: "I know myself I am not completely in the right in this situation, but I really don't want you to be put through anything that isn't fair.  [Plaintiff] really isn't a horrible person and it's taken this to happen for me to realize."  ECF No. 37-11 at 42.  Roe told Plaintiff's girlfriend that Plaintiff was the person "who pushed to do more that night" but that she "should've been strictly no earlier."  *Id.* at 43.  It was not until after Roe had disclosed the encounter to Plaintiff's girlfriend, and Plaintiff had blocked all communication with Roe, that Roe filed a Title IX complaint.  *See id.* at 36.

All of this evidence lends plausibility to Plaintiff's claim, and casts sufficient doubt on Roe's narrative, as to create "articulable doubt as to the accuracy of the outcome of the disciplinary proceeding."  *Colgate Univ.*, 760 F. App'x at 30.

### ii.  Gender Bias as Motivating Factor

Second, there is insufficient evidence to support Plaintiff's claim that gender bias was a motivating factor behind the erroneous finding.  The Second Circuit has found that evidence of sex bias may be gleaned from a variety of sources.  Of course, this includes "statements by members of the disciplinary tribunal, statements by pertinent university officials, or patterns of decision-making that also tend to show the influence of gender."  *Yusuf*, 35 F.3d at 715.  An inference of gender bias may also be permissible where there is a combination of (1) procedural irregularities that show a biased process, and (2) surrounding circumstances that suggest that "this bias was likely a sex-based bias."  *Menaker v. Hofstra Univ.*, 935 F.3d 20, 31 (2d Cir. 2019).  In *Doe v. Columbia University*, for example, the Second Circuit found a complaint sufficient to allege a biased process where the plaintiff alleged that the Title IX panel "chose to accept an unsupported accusatory version over [the plaintiff's]"—which was substantially more supported by the evidence—and "declined even to explore the testimony of [the plaintiff's] witnesses."  *Columbia*,

19

831 F.3d at 57.  The complaint plausibly alleged that this bias was "bias *on account of sex*" insofar as it alleged that the university had been dealing with "substantial criticism" for its failure to "[take] seriously complaints of female students alleging sexual assault by male students."  *Id.* (emphasis added).  "Against this factual background, it [was] entirely plausible that the University's decision-makers and its investigator were motivated to favor the accusing female over the accused male, so as to protect themselves and the University from accusations that they had failed to protect female students from sexual assault."  *Id.*  The Second Circuit has emphasized that even "*minimal* evidence of pressure on the university to act based on invidious stereotypes will permit a plausible inference of sex discrimination."  *Menaker*, 935 F.3d at 33.

On the other hand, in the recent case of *Roe v. St. John's University*,[6] the Second Circuit held that evidence of procedural irregularities may not, standing alone, "automatically permit a factfinder to reasonably infer that a university has committed sex discrimination."  *Roe v. St. John's Univ.*, 91 F.4th 643, 654 (2d Cir. 2024).  This is because "procedural errors are not inevitably a sign of sex bias."  *Id.*

In *St. John's*, the irregularity in question was the university's stated rationale for disciplining a male student for non-consensual sexual contact.  The plaintiff alleged that, while studying in Paris, he visited a local club with another student—the complainant.  After returning to the dorm, the complainant, who was intoxicated, invited the plaintiff, who was sober, into her dorm room.  She then "took [the plaintiff's] right hand and placed it upon her fully clothed breast."  *Id.* at 648.  When the plaintiff indicated that he was "not interested in sex," the complainant told him to "get the hell out of here."  *Id.*  Later, the complainant filed a complaint with the plaintiff's

---

[6] In his supplemental memorandum, Plaintiff noted that the *St. John's* decision was, at that time, the subject of a petition for rehearing *en banc*.  ECF No. 42 at 5-6.  That fact does not "render the panel decision any less binding."  *Collado v. N.Y.C. Dep't of Educ.*, No. 19-CV-2943, 2021 WL 918292, at *2 (S.D.N.Y. Mar. 10, 2021).  The petition has since been denied.  *See Roe v. St. John's University*, No. 21-1125 (2d Cir. Mar. 1, 2024), ECF No. 145.

university.   The disciplinary board concluded that the plaintiff was responsible for "non-consensual sexual contact" because he "admitted [to] engaging in physical contact of a sexual nature with [the complainant], and the evidence demonstrated a lack of affirmative consent to engage in such contact."  *Id.*

The plaintiff asserted that the university's decision supported an inference of gender bias because it was irrational: it "[found] *him* in violation of the [university's] rules based upon the conduct of [*the complainant*] taking his hand and placing it upon her breast."  *Id.* at 654 (emphases added).  As the dissent put it, "the complaint [] alleged that the [university] [b]oard accepted [the plaintiff's] admitted version of events, that those events involved no wrongdoing, and that the [board] disciplined him anyway."  *Id.* at 670 (Menashi, J., dissenting).

The majority disagreed.  The court instead held that, even if the university "erroneously concluded that the plaintiff violated [its] Student Code of Conduct," it "[did] not follow that [the university] reached this allegedly erroneous outcome due to gender bias."  *Id.* at 653.  Facts suggesting that a university conducted its disciplinary proceedings in a "less-than-flawless manner," or even with "potentially serious flaws," does not "automatically permit a factfinder to reasonably infer that a university has committed sex discrimination."[7]  *Id.*  Procedural irregularities must be combined with other facts to permit an inference of sex bias.  *See id.* at 655-56; *see also Sanchez v. Helen Porter Nursing Home, Inc.*, No. 20-CV-153, 2023 WL 6516406, at *7 (D. Vt.

---

[7] In *St. John's*, the court recognized that "in some cases an erroneous decision is sufficiently 'inexplicable' to warrant inferring that the university reached its decision due to sex-based bias."  *St. John's*, 91 F.4th at 655-56.  The parameters of this exception are not clearly defined in *St. John's*, but the court suggested that the errors must be such as to give "grave doubts as to the merits of the decision itself."  *Id.* at 656 (internal quotation marks omitted); *see also Doe v. Oberlin Coll.*, 963 F.3d 580, 588 (6th Cir. 2020) (rationale for university's decision supported inference of sex bias, where disciplinary panel found that complainant could not consent because she was "not sober," despite the fact that, under university policy, intoxication "does not negate consent").  The Court cannot say that Roe's complaint so lacks credibility that RIT's finding of responsibility establishes its unwillingness to ever "acquit a [male] respondent." *Oberlin*, 963 F.3d at 588.

Oct. 5, 2023) (in disability-discrimination context, noting that "procedural irregularity alone is not enough to support an inference of discrimination – it must contribute to other evidence already pointing in the direction of discrimination" (internal quotation marks omitted)).  This necessary factual showing is not high.  *See Menaker*, 935 F.3d at 33 n.48 ("It is precisely because procedural irregularity alone *already* suggests bias that even minimal evidence of sex-based pressure on the university is sufficient to establish bias on account of sex.").

Despite this low bar, Plaintiff relies solely on procedural irregularities to support an inference of sex bias.  Other indicia that the Second Circuit has found sufficient to infer sex bias are absent from this case.  For example, Plaintiff does not present any evidence of an "atmosphere of public pressure" on RIT that could suggest it was motivated to "act based on invidious stereotypes."  *Menaker*, 935 F.3d at 31, 33.  Nor does Plaintiff identify any "statements by members of the disciplinary tribunal [or] statements by pertinent university officials" that disclose a discriminatory intent.[8]  *See Yusuf*, 35 F.3d at 715; *see, e.g.*, *Abraham v. Thomas Jefferson Univ.*, No. 20-CV-2967, 2021 WL 4132566, at *6 (E.D. Pa. Sept. 10, 2021) (faculty member's comment that "a man cannot be sexually assaulted by a woman" was "evidence of possible gender bias against males").  At most, Plaintiff cites statements and conduct from RIT officials that suggest their hostility or bias against him.[9]  *See* ECF No. 30 at 23-24.  But facts that "support an inference

---

[8] At one point during the second hearing, Smith-Schubart accused Plaintiff of relying on "tropes" about consent, namely, that "we did this before so it's okay this time."  ECF No. 33-2 at 44.  This accusation—that, in substance, Plaintiff believed himself to be entitled to sexual activity given past sexual encounters—might arguably be "evocative of [a] prejudicial stereotype[]" about male predation.  *Moseley v. Preston Cycles West, LLC*, No. 19-CV-3937, 2021 WL 4815901, at *16 (N.D. Ga. July 30, 2021).  However, Plaintiff does not identify Smith-Schubart's ambiguous comment as one suggesting discriminatory intent.  *Cf. Bergesen v. Manhattanville Coll.*, No. 20-CV-3689, 2021 WL 3115170, at *6 (S.D.N.Y. July 20, 2021) (collecting cases for the proposition that, unless the allegedly stereotyped remarks have "plain connotations," courts "do not find that stereotypes have influenced employment decisions" (internal ellipsis omitted)).  The Court declines to further address this comment in the absence of developed argument by Plaintiff.  *See United States v. Zannino*, 895 F.2d 1, 17 (1st Cir. 1990) (stating that a court is not required "to do counsel's work, create the ossature for [an] argument, and put flesh on its bones").

[9] Plaintiff suggests that the harsher sanction levied against him after the second hearing reflects "a gender biased belief that males need to be sanctioned severely for alleged sexual misconduct," ECF No. 30 at 27, but he fails to support

of bias" do not "necessarily relate to bias *on account of sex*." *Columbia*, 831 F.3d at 57 (emphasis added).

That leaves only the procedural irregularities in his disciplinary proceedings. As the *St. John's* court emphasized, however, the fact that a flawed proceeding "led to an adverse and erroneous outcome, with a mere "conclusory allegation of gender discrimination," is insufficient to support a Title IX claim. *St. John's*, 91 F.4th at 655 (quoting *Yusuf*, 35 F.3d at 715). Therefore, although Plaintiff identifies a number of procedural irregularities—which are, in fact, sufficient to support a breach-of-contract claim against RIT—he does not provide the "minimal evidence" necessary to establish that any potential bias underlying those irregularities was "on account of sex." *Menaker*, 935 F.3d at 33 n.48. Accordingly, Plaintiff fails to present sufficient evidence to support his erroneous-outcome claim.

### b. Undue Severity

"[U]nder a selective enforcement theory, a plaintiff claims [that] regardless of the student's guilt or innocence, the severity of the penalty and/or the decision to initiate the proceeding was affected by the student's gender." *Doe v. N.Y.U.*, 438 F. Supp. 3d 172, 181 (S.D.N.Y. 2020) (internal quotation marks omitted). Plaintiff raises an "undue severity" claim, arguing that he "received a harsher sanction from the second Hearing Officers in comparison to the first Hearing Officers." ECF No. 30 at 27. That discrepancy was the result of sex bias, in Plaintiff's view, based on the same facts that support his erroneous-outcome claim. *Id.* at 27-28.

---

that allegation with any record evidence. Similarly, Plaintiff's allegation that RIT's use of "trauma-informed" training is necessarily gender-biased is not supported by record evidence. *Id.* at 20.

As stated above, Plaintiff has failed to present sufficient evidence of sex bias based on the procedural irregularities he has identified.[10]  Therefore, he has failed to raise a genuine issue of material fact as to whether "the severity of [his] penalty" was "affected by [his] gender."  *N.Y.U.*, 438 F. Supp. 3d at 181.

Therefore, summary judgment is warranted on both of Plaintiff's Title IX theories.

**CONCLUSION**

 For these reasons, RIT's motion for summary judgment (ECF No. 25) is GRANTED IN PART and DENIED IN PART.  Only Plaintiff's claim for breach of contract survives summary judgment and will proceed to trial.  By separate order, the Court will schedule a status conference, at which the parties should be prepared to discuss their readiness for trial.

IT IS SO ORDERED.

Dated:  March 11, 2024
        Rochester, New York

HON. FRANK P. GERACI, JR.
United States District Judge
Western District of New York

---

[10] In passing, Plaintiff mentions that "[i]n the last six months of 2021, when [Plaintiff's] case was adjudicated to suspension, there were 11 complaints."  ECF No. 30 at 28; *see also* ECF No. 42 at 13.  Five of those complaints led to a finding of responsibility and a sanction of probation, but "no one went through a formal hearing and [was] suspended."  ECF No. 30 at 28.  Because Plaintiff does not present any evidence that these cases were similarly situated to his, an inference of discriminatory intent cannot be derived from these statistics.  *See St. John's*, 91 F.4th at 660-61; *Radwan v. Manuel*, 55 F.4th 101, 132 (2d Cir. 2022).